[Criminal No. 708.    Filed December 15, 1930.]

[294 Pac. 268.]

CHARLES R. FOSTER, Appellant, v. STATE, Respondent.

Mr. Alexander Murry and Mr. Frank E. Thomas, for Appellant.

Mr. K. Berry Peterson, Attorney General, Mr. Riney B. Salmon and Mr. Lloyd J. Andrews, Assistant Attorneys General, and Mr. James T. Gentry, County Attorney, for the State.

ROSS, J.—The defendant, Charles R. Foster, upon a charge of murdering on February 16, 1929, one Martin Parko in Cochise county, was by the verdict of a jury of that county, found guilty and condemned to suffer death. From the verdict and the judgment and sentence of the court pronounced in accordance with the verdict, he has appealed.

While every material issue of the information filed against defendant was of course traversed by the plea of not guilty, the only issue upon which defendant offered any evidence was that of his sanity. He undertook to show that he was not guilty by reason of his insanity. We state the defendant's theory of his defense upon the trial because it is important in the consideration of his various assignments of error. We think we should state that he was defended by two members of the bar experienced and learned in the law; and that the trial record discloses they manifested their usual interest and skill in his behalf.

Before taking up the reasons given by defendant for his appeal, we outline the salient facts immediately surrounding the finding of the body of the deceased, the circumstances pointing to defendant as the party committing the homicide, and also defendant's explanation thereof.

Before it was light on the morning of February 16, 1929, defendant called at the ranch-house of one Louis B. Larson, situate on public highway No. 80 about five miles west of Benson, and asked the loan of a jack to be used in starting his automobile. A little later he returned to Larson's and requested the latter to tow his car so that the engine would start. The car was a blue Ford coupé and Larson assisted in starting it by attaching his own car thereto and towing it about 200 feet on to the main road, when the engine began to work. Defendant then drove off in

the direction of Benson. Before going, however, he wanted to sell the Ford to Larson. He appeared at a service station in Benson at about 7 o'clock, obtained water for the engine, and here again wanted to sell the car. About 8:30 o'clock Larson, while on his way to do some repair work on the fence on his premises, discovered blood marks and signs on the surface of the ground under or near the fence as though something had been dragged, and, being attracted thereby, he followed the blood marks and other signs, which originated not far from where the Ford had stood, for about 75 yards northerly into a field and 25 yards westerly, where he came upon a dead body in a wash or depression, the head covered with an old coat. He thereupon notified the peace officers of Cochise county of his discovery. About 2:30 or 3 o'clock that afternoon defendant appeared, driving the same blue Ford coupé at a service station in Lordsburg, New Mexico, and while he was trying to get one of the rims repaired, or to sell the car, he was arrested.

Some four hours after his arrest, Sheriff George Henshaw of Cochise county, and two deputies, and a special agent of the Southern Pacific Company, arrived at Lordsburg, and the New Mexico officials turned defendant over to them, who returned him, the five of them riding in the sheriff's car to Benson, arriving there at 2:30 o'clock the morning of February 17th. On the return trip defendant confessed to the sheriff and his deputies and the Southern Pacific special agent that he had killed Martin Parko, near Larson's house, by shooting him in the head while he was in a recumbent position on the seat of the car, with his head wrapped with a blanket, asleep or trying to sleep. He said that he was "hitch hiking" from Los Angeles, California, to Claysville, Pennsylvania, where he was born and

reared, when Parko, driving the Ford coupé, overtook him at El Centro, California, and gave him a lift; that he had ridden with Parko from El Centro, by way of Yuma, California, through Phoenix, Arizona, to Larson's place, where they had camped for the night; that he was tired, having had but little sleep since leaving Los Angeles, and that he had had very little food. He admitted that the pistol with which he shot Parko was his; that he stripped Parko of all his money, some $15, his watch, a pocket folder, in which were some papers identifying Parko as Mike A. Baker (these personal things of the deceased having been taken from the defendant after his arrest); that he threw the pistol away immediately after the fatal shot; and that he hid the blanket that was around Parko's head when he shot him. The pistol and blanket were later found in the places or localities he said he left them. The pistol had one empty shell, and the blanket was powder burned and stained with blood. He gave to the officers the name of Mike A. Baker, corresponding with identification papers found on the deceased by him.

The confession was obtained by the officers from him by persistent questioning. They did not threaten defendant, but they pressed him to tell the truth about the matter. They made no promise of any favors; neither did they advise him of his right to keep silent or tell him if he inculpated himself it would be used against him.

On the trial Sheriff Henshaw gave the confession in much greater detail than we have stated it, without any objection whatever from defendant. Deputy Sheriff Fred Bennett, testifying, had related the circumstances under which the confession was made, and had said, "So he (defendant) started in then and told the story that Mr. Henshaw said on the stand,"

whereupon for the first time counsel for defendant objected in these words:

" . . . I take it that the story he told Mr. Henshaw was inadmissible as the defendant had not been properly cautioned, and that it couldn't have been introduced as a confession. I didn't make the objection at that time, but I object at this time to any repetition of it on the ground that it purports to be a confession and it wasn't lawfully obtained, and for that reason that a repetition of it should not be given to the jury."

This objection was overruled, and Bennett related the confession as he remembered it. At the close of his testimony, defendant moved to strike all evidence of the alleged confession, on the ground that it was improperly obtained, which motion was denied. Like objections and rulings were made with reference to the testimony of Deputy Sheriff Jess Moore and special agent of the Southern Pacific, J. R. Birmingham. Soon after the sheriff's party arrived in Benson with defendant, he repeated his confession in the presence of the county attorney, his deputy, the sheriff, and others, which confession was taken down stenographically. This confession was also read to the jury, and defendant objected on the ground that it was not voluntary. These two confessions, the oral one made on the way back from Lordsburg and the written one made at Benson, are the bases of two separate assignments.

We do not deem it necessary under the circumstances to determine whether the confessions were obtained by lawful means or not. It may be that they were not. Whatever the fact, for reasons best known to defendant, it is manifest that he wanted the jury to hear from the lips of the sheriff defendant's story of his mental and physical condition when he killed Parko. By his silence, or refusal, or failure to object to the confession being detailed to the jury

by this witness, he consented thereto as effectively as if he had offered it himself. The proof of the confessions by subsequent witnesses, to which objection was made, was but a repetition of the sheriff's testimony, with the usual and natural discrepancies. The sordid story, while convicting defendant of the homicide, at the same time doubtless caused the jury to wonder why he had thus taken the life of his benefactor, the man who had befriended him by giving him a lift across the deserts of California and Arizona in the dead of winter.

Later on, counsel for defendant, in putting in their defense, took advantage of these confessions in propounding hypothetical questions based thereon to Dr. Win Wylie, an expert witness, as is shown by the following questions and answers:

"Q. You have listened to the testimony of the witnesses with reference to all of the facts alleged to surround the murder by him of Martin Parko? A. I have

"Q. *Alias* Mike Baker, you have listened to the relation of the story which he gave of that? A. As disclosed by the confession?

"Q. Yes. A. Yes, sir.

"Q. Doctor, I will ask you, from your observation of this man, from your study of this subject, and from the testimony in this case, if you believe that at the time when the defendant killed Martin Parko, *alias* Mike Baker, he was sane or insane? .... A. Insane."

We think, even though it was not shown that the confessions were voluntarily made, they should not on appeal be held erroneously admitted when no objection was interposed until after the principal facts in that connection had been told to the jury, and especially so in view of the use made of such confessions to establish the defendant's defense of insanity. We, of course, have no means of knowing what the defense would have done had the prosecu-

tion not introduced evidence of the confessions, but that they lent color to the defense of insanity seems quite clear.

It is contended the following instruction, especially the last sentence thereof, comments on the weight of the evidence, in violation of section 12, article 6, of the Constitution, and subdivision 6 of section 5042, Revised Code of Arizona 1928, concerning instructions to juries in criminal cases:

"Verbal statements or admissions should be received by you with great caution, owing to the person speaking not having clearly expressed his own meaning, or the person spoken to not having clearly understood the·speaker. It frequently happens, also, that the witness, by unintentionally altering a few words or expressions really used, gives an effect to the statement entirely at variance with what the speaker actually did say. But when such verbal statements are precisely given, and identified by intelligent and reliable witnesses, they are often entitled to great credit."

We agree with defendant that this instruction comments on the weight of the evidence and is erroneous. Whether the testimony of those detailing defendant's confessions should be given great credit or not is exclusively a question for the jury, but, in view of the defense of insanity, we think this error was harmless. The statements and admissions referred to in the instruction were evidently those in the confessions, and these were not disputed or controverted in the trial, but were taken advantage of by defendant to establish that he was insane at the time of the commission of the homicide.

The court did not instruct the jury upon murder in the second degree or upon manslaughter. The instructions were confined to murder in the first degree and to the defense of insanity. Defendant contends that in all cases of wilful, deliberate and premeditated murder it is the duty of the court to

instruct on all degrees, and the province of the jury to determine from the facts the degree of which the defendant is guilty.

In *Singh* v. *State,* 35 Ariz. 432, 67 A. L. R. 129, 280 Pac. 672, 677, we considered the precise point here made, and held:

"When the facts as disclosed by all the evidence in the case show murder in the first degree or nothing—no mitigation, excuse, or justification—we said in *Campbell* v. *Territory,* 14 Ariz. 109, 125 Pac. 717, 721, 'The court need not instruct the jury as to other grades of the offense.' "

Although in the Singh case we did not refer to the decisions holding with defendant's contention, we examined them thoroughly, and rejected their reasoning and conclusions as illogical. We can see no reason for submitting the issue of second degree murder or manslaughter to the jury when the evidence conclusively shows defendant guilty of the highest degree of the crime or not guilty at all by reason of his insanity. There is no middle ground in such case, no evidence tending to show the lower degree of murder or manslaughter.

Lastly, complaint is made of the court's refusal to give the following instruction:

"It is the law, that although you believe that at the time of the killing of Martin Parko, *alias* Mike Baker, the defendant was not insane, as insanity has been defined to you by the court, nevertheless, if all of the evidence relative to defendant's insanity leaves in your minds a reasonable doubt of his ability to deliberate and premeditate upon said killing, at the time of its commission, you cannot find the defendant guilty of murder in the first degree."

The presumption of law is that every person charged with crime is sane, and the presumption, therefore, is that the defendant was sane when he committed the act. If a person would avoid the

290

consequences of his act on the ground of his inability to perceive and know such act to be wrong, it is incumbent upon him at least to raise a doubt in the minds of the jury as to his sanity. If the jury believed from the evidence that defendant was sane, the law implies deliberation and premeditation from the circumstances of the killing. The degree of the crime is not dependent upon defendant's intelligence or lack of intelligence, his power to reason or not to reason. If he knew the nature and quality of his act and that it was wrong (*Lauterio* v. *State*, 23 Ariz. 15, 201 Pac. 91), he is amenable to punishment therefor to the same extent as if he were one whose sanity is not questioned. The law does not discriminate between degrees of intelligence in fixing the penalty. We conclude the court properly refused the instruction.

The judgment is affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.