[Criminal No. 925.   Filed December 7, 1942.]

[131 Pac. (2d)  810.]

# STATE OF ARIZONA, Appellee, v. ELISANDRO MACIAS, Appellant.

Mr. Joe Conway, Attorney General, Mr. W. E. Polley, Assistant Attorney General, and Mr. J. M. Johnson, County Attorney, for Appellee.

Mr. Greg Garcia, for Appellant.

LOCKWOOD, C. J.—Elisandro Macias, defendant, was informed against by the county attorney of Pima County, for the crime of murder in the first degree. Before the case was set for trial, defendant's attorney filed an affidavit with the court claiming that defendant was unable on account of his mental condition to properly defend any action brought against him. § 44–1701, Arizona Code 1939. The matter was heard and a large amount of testimony was taken, after which the court

held that defendant's mental condition was not such that he was unable to properly assist in the defense of the action.

The case came on for trial on the main issue before a jury. It was not disputed at the trial that defendant had killed one Abdo Hage by stabbing him to death with a knife. Defendant himself took the stand and freely admitted the killing, but gave as an excuse therefor that the deceased had insulted defendant's mother by referring to her in an approbrious manner and that this conduct alone was the cause of the killing. The state, on the other hand, offered evidence tending to show that defendant had gone to the store of the deceased for the purpose of robbing him, and had killed him while engaged in such a robbery.

The chief defense, however, was that defendant at the time of the killing was insane, and much testimony was offered by both the state and defendant upon this point. The jury, by its verdict, determined that defendant was sane, and that the murder was in the first degree, and fixed the penalty at death, whereupon this appeal was taken.

There are four assignments of error which we will consider in their proper order. The first is that the instructions of the trial court in regard to the defense of insanity were erroneous, ambiguous and confusing. The particular instruction objected to reads as follows:

" . . . Although he may have been laboring at the time of the alleged homicide under partial insanity, as, for instance, suffering from some insane delusion and hallucination, or some loss of memory, or if at that time he was actuated and impelled by some passion, some hatred, some anger, some revenge which caused him to commit the alleged homicide, or if he simply lacked normal development of his moral sensibilities so he had slight regard for human life—as I say, even though he was suffering from, or influenced by, or impelled by any and all of those things, or things of a similar na-

ture in the commission of the alleged homicide, still, being so impelled and influenced, if he understood at the time of the commission of the alleged homicide, or the other acts alleged—if you believe beyond a reasonable doubt that the defendant committed those acts—still, if he understood and appreciated the nature and character of his action and its consequences; and if he had knowledge that his acts were wrong and criminal, and in violation of law, and that they might subject him to punishment; and if he knew that if he did the acts he would do wrong, then and in that event he is responsible for his acts, and such partial insanity, such passion, such hatred, such revenge, such moral insensibility, or the like, if he was actuated by any such, would not be sufficient to relieve him from the responsibility of his criminal act.''

█ The question as to the nature of the insanity which will excuse a man from responsibility to the criminal law for the consequence of his act has been before the courts many times, and there is considerable conflict of opinion upon the subject. This difference is probably due to the failure on the part of certain courts to differentiate between ''insanity'' as a legal term in criminal law, and ''insanity'' as a medical term. So far as the latter is concerned, the situation is ''confusion worse confounded.'' Medical experts discuss congenital, delusional, emotional, moral and recurrent insanity, with the various subdivisions of dementia praecox and senile dementia, hallucinations, illusions, irresistible impulse, and a hundred others until one is almost tempted to say with the Quaker, ''All the world is queer except thee and me, Betsey, and sometimes thee's a little queer.'' The theories of free will and determinism, with the various deductions which may be made therefrom are subjects of discussion for philosophers, but the courts in applying principles of law must necessarily have some definite standard of comparison which is practical and workable in its nature. Whatever we may say as to the theoretical question, every man regu-

lates his entire life on the presumption that he has free will to act, and the law must necessarily assume and act upon the presumption that every man with knowledge of the facts has the power to decide between different possible courses of action. In determining whether one accused of crime is relieved of the consequences thereof by mental aberration, the vast majority of the courts have very sensibly acted upon this theory and have enunciated a test, clear and simple in principle, which affords a definite yardstick to apply to the frequently voluminous, confused and contradictory testimony which is presented to the triers of fact. The leading case upon this subject, and the one which is cited in practically every well reasoned opinion determining the test of insanity, is M'Naghten's Case, 8 Eng. Reprint, 718, which uses the following language:

" . . . that to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong. The mode of putting the latter part of the question to the jury on these occasions has generally been, whether the accused at the time of doing the act knew the difference between right and wrong: which mode, though rarely, if ever, leading to any mistake with the jury, is not, as we conceive, so accurate when put generally and in the abstract, as when put with reference to the party's knowledge of right and wrong in respect to the very act with which he is charged. If the question were to be put as to the knowledge of the accused solely and exclusively with reference to the law of the land it might tend to confound the jury, by inducing them to believe that an actual knowledge of the law of the land was essential in order to lead to a conviction; whereas the law is administered upon the principle that every one must be taken conclusively to know it, without proof that he does not know it. If the accused was conscious that the act was one which he ought not to do, and if that act

was at the same time contrary to the law of the land, he is punishable; and the usual course therefore has been to leave the question to the jury, whether the party accused had a sufficient degree of reason to know that he was doing an act that was wrong: and this course we think is correct, accompanied with such observations and explanations as the circumstances of each particular case may require.

"The fourth question which your Lordships have proposed to us is this: 'If a person under an insane delusion as to existing facts, commits an offense in consequence thereof, is he hereby excused?' To which question the answer must of course depend on the nature of the delusion: but, making the same assumption as we did before, namely, that he labours under such partial delusion only, and is not in other respects insane, we think he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real. For example, if under the influence of his delusion he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment."

The great majority of the states accept the principles laid down in the M'Naghten case, *supra,* as being correct. This is true in California, Colorado, Georgia, Idaho, Illinois, Kansas, Mississippi, Missouri, Nebraska, New Jersey, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Washington and West Virginia. The majority of the jurisdictions which have adopted a contrary rule apparently base it upon the hypothesis, unworkable practically even if plausible in theory, that the accused may have no power to *act* as between right and wrong, even though he may have *knowledge* thereof. As was said in the case of *Eatman* v. *State,* 169 Miss. 295, 153 So. 381:

"The courts place the general rejection of the defense of uncontrollable impulse upon practical grounds. Said our court in the Smith case, *supra* [*Smith* v. *State,* 95 Miss. 786, 49 So. 945, 27 L. R. A. (N. S.) 461]: 'It is known among medical writers as lesion of the will. Its peculiarity is said to be that, while the mental perception is unimpaired, the mind is powerless to control the will; that while its unhappy subject knows the right, and desires to pursue it, some mysterious and uncontrollable impulse compels him to commit the wrong. This kind of insanity, if insanity it can be called, though sometimes recognized by respectable courts, and still oftener, perhaps, by juries seeking an excuse to evade the stern dictates of the law, is properly rejected by the authorities generally. The possibility of the existence of such a mental condition is too doubtful, the theory is too problematical, and too incapable of a practical solution, to afford a safe basis of legal adjudication. It may serve as a metaphysical or psychological problem to interest and amuse the speculative philosopher, but it must be discarded by the jurist and the lawgiver in the practical affairs of life.' "

We have previously adhered to the rule of the M'Naghten case, *supra,* in *Foster* v. *State,* 37 Ariz. 281, 294 Pac. 268, and *Judd* v. *State,* 41 Ariz. 176, 16 Pac. (2d) 720, and we see no reason to depart from it. The instruction complained of, when tested by this standard, states in language simple and easily understood by the jury what type of insanity would and what type would not relieve defendant from the consequences of his act, and there was no error in it.

The next question is as to whether the evidence would sustain the finding of the jury that defendant was at the time he committed the homicide sane, within the meaning of the law as thus set forth. There were several medical witnesses who testified upon the subject and a number of laymen. In cases of this kind the testimony of a lay witness who has had the opportunity of observing the past conduct and history of a defendant is as admissible on the question of whether he was

or was not legally insane at the time he committed the act in question as that of a medical witness, the weight to be given to the testimony being determined by the triers of fact. 23 C. J. S., Criminal Law, § 867, pp. 78–80, and cases cited.

Upon examining the testimony of the medical witnesses, we think it is obvious that when they testified in their opinion the defendant was insane at the time he committed the homicide, they were either consciously or unconsciously basing their answer upon the definitions of medical insanity, rather than the legal insanity which is the law of Arizona, while the lay witnesses for the most part were considering the legal test of the knowledge of right and wrong. That the defendant was what is commonly called an introvert was admitted by all of the witnesses, but that does not constitute legal insanity. That some of his acts were such as the average man would not commit was also probably true, but this again does not excuse a man from the consequences of his violation of the law. He had finished the common school course with reasonable, if not exceptionable, credit, and had spent some time in the high school, apparently leaving the latter voluntarily and not because of a failure to keep up with his work. Under these circumstances, he would not necessarily be classed automatically as an idiot, imbecile, or even a low grade moron, not capable of understanding the nature of his acts and the consequence thereof. Certainly we cannot say, as a matter of law, that the jury was not justified in finding that he was sane, within the legal meaning of the term, so as to be responsible for the consequences of his admitted conduct.

The next question is whether the county attorney erred in stating to the jury that if, in fixing the penalty, they should determine on life imprisonment, the probabilities are that the actual service would only be a few years. We have held in *Sullivan* v. *State,* 47

Ariz. 224, 55 Pac. (2d) 312, 318, referring to similar remarks:

" . . . Under the law of Arizona, in first degree murder cases, the jury fixes the penalty at either death or life imprisonment, in its discretion. The statute does not prescribe what jurors shall or shall not consider in the exercise of this discretion. We think that the probability of a defendant, whose punishment has been fixed by a jury at life imprisonment, actually having to serve the penalty so fixed, is one of the questions which it is highly proper for a jury to consider in the exercise of its discretion, and as was said in the case of *Frady* v. *People, supra* [96 Colo. 43, 40 Pac. (2d) 606], under somewhat similar circumstances: 'It was a statement of fact, known to all men, doubtless present in the minds of the jurors without being mentioned.' . . . "

and we think the same rule applies in the present case.

█ There were other remarks made by the county attorney which are assigned as error, but as no exceptions were taken to them at the time of the trial, and no request was made that the court instruct the jury to disregard them, we do not consider such assignment. *Sullivan* v. *State, supra.*

█ Upon consideration of the whole record in the case, we think it is singularly free from legal error. The homicide by the defendant was unquestioned; his sanity was determined by the jury upon evidence sufficient to sustain its conclusion, and there was evidence which would authorize it to find that the homicide was committed in the perpetration of a robbery.

The judgment is affirmed.

McALISTER and ROSS, JJ., concur.