403 P.2d 521

**STATE of Arizona, Appellee,**

v.

**Joseph Alvin SCHANTZ, Appellant.**

No. 1322.

Supreme Court of Arizona.

En Banc.

June 23, 1965.

Rehearing Denied July 13, 1965.

**204**

Darrell F. Smith, Atty. Gen., Robert W. Pickrell, former Atty. Gen., Paul G. Rosenblatt, Asst. Atty. Gen., for appellee.

Lewis, Roca, Scoville, Beauchamp & Linton, John J. Flynn and James Moeller, Phoenix, for appellant.

STRUCKMEYER, Vice Chief Justice.

The defendant Joseph Alvin Schantz was informed against and tried for the murder of his wife, Matilda Schantz. The trial court directed a verdict of not guilty of first degree murder and the jury returned a verdict of murder in the second degree on his plea of not guilty. From the judgment and sentence thereon he appeals.

On March 24, 1962, defendant and his wife resided at 1440 South 41st Place in the City of Phoenix. At about the hour of 12:30 a. m. several neighbors were awakened by Mrs. Schantz screaming. They looked into the kitchen window of the Schantz' residence and saw the defendant and his wife struggling over a butcher knife held by the defendant. The deceased in the course of the struggle fell to the floor and defendant was observed stabbing her repeatedly in the back and neck. Thereafter, defendant seized a ten-inch cast-iron skillet and beat deceased about the head and body. When the police arrived, they found the deceased on the floor, cut and bleeding, and the skillet broken into pieces. At that time, defendant's demeanor was described as calm and a little talkative. Defendant pleaded not guilty and subsequently, pursuant to Rule 192, Rules of Criminal Procedure, 17 A.R.S., served a written notice of his intention to show in evidence that at the time of the offense he was insane or mentally defective.

Doctor Maier Tuchler, a psychiatrist, was called by defendant and he testified that he had examined defendant on numerous occasions since the offense and gave as his opinion that defendant at the time of the offense did not know the nature and significance of his acts and did not know right from wrong. He further testified that defendant had total amnesia for the events related to the homicide and that his efforts to bring back defendant's memory were unsuccessful; that an amnesia state exists where the emotional state predominates without the conscious awareness of the individual; that actions in such a state are outside the person's deliberate volitional conscious awareness.

At the conclusion of the evidence, defendant moved that the jury be directed to return a verdict of acquittal. The motion was granted as to the charge of first degree murder and denied as to second degree and manslaughter. The issues of deliberation and premeditation arising out of the charge of first degree murder could have been submitted to the jury since the jury was not compelled to accept the uncontradicted opinion testimony of an expert, Sapp v. Lifrand, 44 Ariz. 321, 36 P.2d 794, and see Commonwealth v. Carroll, 412 Pa. 525, 194 A.2d 911, nor the uncorroborated testimony of a party to an action, Rowe v. Goldberg Film Delivery Lines, Inc., 50 Ariz. 349, 72 P.2d 432. However, where the trial judge has a conscientious conviction that all the elements of an offense have not been established beyond a reasonable doubt, e. g., premeditation or deliberation, he has not only the right but the duty to direct a verdict of acquittal.

The defendant then proposed that there be submitted to the jury his requested instruction No. 30 [1] which the trial court refused. Defendant thus raises the question whether the evidence of Dr. Tuchler, that the defendant's acts were without his deliberate volitional conscious awareness, may be considered by the jury to negate malice aforethought. The issue presented requires a somewhat extended examination of the law of homicide as it exists in this jurisdiction.

The legislature has prescribed a simple and complete system of laws for the handling of homicides in Arizona. It presents no paradoxes or dilemmas although the application of the facts to the law is not always simple or easy. By A.R.S. § 13–451 et seq., the unlawful killing of a human being with malice aforethought is murder. The killing is unlawful if it is not excused by § 13–460 or justified under §§ 13–461 and

1. Defendant's requested instruction No. 30:

"It should be noted that a character or behavior disorder, the nature or severity of which is such that it may have interfered with the accused's capacity to contrive and design, may constitute evidence tending to negate the accused's capacity to entertain the required malice aforethought, specific intent or knowledge.

"You are advised that an accused may be mentally responsible in a general criminal sense and yet, because of some underlying mental impairment or deficiency, be mentally incapable of entertaining the (intentional design to kill) (specific intent) involved in the offense of murder.

You should therefore consider, in connection with the other evidence, the evidence tending to show that the accused was suffering from a mental impairment, defect, disorder, or deficiency in determining whether he had sufficient mental capacity to entertain, and did in fact entertain the (malice aforethought) (specific intent) involved in the offense of murder. Unless, in the light of all the evidence, you are satisfied beyond a reasonable doubt that the accused, at the time of the alleged offense, was mentally capable of entertaining, and did entertain, the (malice aforethought) (specific intent) involved in the offense of murder, you must find the accused not guilty of that offense."

13–462.[2] Malice aforethought is more than ill will, hatred or revenge. It means the intent to kill without legal justification.[3] State v. Hudson, 85 Ariz. 77, 331 P.2d 1092; Bennett v. State, 15 Ariz. 58, 136 P. 276.

▉ If the killing is wilful, deliberate and premeditated or committed during the perpetration of certain specified crimes, i. e., robbery, it is of the first degree. If the unlawful killing lacks wilfulness, deliberation or premeditation and is not in the commission of one of the specified crimes but if accompanied by malice aforethought, it is murder of the second degree. If an unlawful killing lacks the element of malice aforethought, it is still the lesser offense known as manslaughter which if committed upon a sudden quarrel or heat of passion is known as voluntary manslaughter. It may be here observed that while technically manslaughter is not a degree of murder, in substance they are different degrees of the single crime of criminal homicide, Chisley v. State, 202 Md. 87, 95 A.2d 577; State v. Hutter, 145 Neb. 798, 18 N.W.2d 203; and see Rhea v. Territory, 3 Okl.Cr. 230, 105 P. 314.

Murder of the first degree is punishable by death or imprisonment in the State Prison for life at the discretion of the jury trying the person charged or the judge upon a plea of guilty. Murder in the second degree is punishable by imprisonment in the State Prison for not less than ten years, and a conviction for manslaughter subjects the accused to imprisonment in the State Prison for not to exceed ten years. A.R.S. §§ 13–452, 13–454 and 13–456.

▉ In the past, Arizona has uniformly adhered to what is known as the Rule of M'Naghten's Case as the test for criminal insanity. State v. Preis, 89 Ariz. 336, 362 P.2d 660, cert. den. 368 U.S. 934, 82 S.Ct. 372, 7 L.Ed.2d 196; State v. Crose, 88 Ariz. 389, 357 P.2d 136; State v. Coey, 82 Ariz. 133, 309 P.2d 260; State v. Eisenstein, 72 Ariz. 320, 235 P.2d 1011; State v. Macias, 60 Ariz. 93, 131 P.2d 810; Burgunder v. State, 55 Ariz. 411, 103 P.2d 256; Judd v. State, 41 Ariz. 176, 16 P.2d 720; Foster v. State, 37 Ariz. 281, 294 P. 268; Lauterio v. State, 23 Ariz. 15, 201 P. 91.

In 1843, in M'Naghten's Case, one Daniel M'Naghten killed a man with a shot intend-

2. Certain persons are not punished for their acts or omissions. See A.R.S. § 13–134. By A.R.S. § 13–135, children under the age of fourteen years, in the absence of clear proof at the time of committing the act charged against them they knew its wrongfulness, and idiots, lunatics and insane persons are considered as incapable of committing crimes.

3. "Undoubtedly the word 'aforethought' was added to 'malice' in the ancient cases

to indicate a design thought out well in advance of the fatal act. But as case after case came before the courts for determination, involving killings under a great variety of circumstances, there came to be less and less emphasis upon the notion of a well-laid plan. And at the present day the only requirement in this regard is that it must not be an *after*thought." Perkins on Criminal Law, p. 30. (Emphasis in original.)

ed for Sir Robert Peel. M'Naghten was tried for murder. The Queen v. M'Naghten, 4 St.Tr.(N.S.) 847. It was established that he was laboring under an insane delusion and in a seriously disordered mental condition. He was found not guilty under an instruction which told the jury to acquit him if he "had not the use of his understanding, so as to know he was doing a wrong or wicked act." The House of Lords, 10 Clark & Fin. 200, 8 Eng. Reprint 718, put certain questions to the judges who answered:

> "[T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." 8 Eng. Reprint at p. 722.

This was in substance the test of legal insanity as it was known to the common law of England. See Rex v. Arnold, 16 Howell St.Tr. 695, 764 (1724).

■ This test of legal insanity has two elements. An accused must have had at the time of the commission of the criminal act:

(1) Such a defect of reason as not to know the nature and quality of the act, *or*

(2) If he did know, that he did not know he was doing what was wrong.

Where insanity is an issue, the burden of the State is to establish beyond a reasonable doubt the converse; that is, that the defendant knew the nature and quality of his act *and* that he knew that what he was doing was wrong. Whereas the M'Naghten test for criminal responsibility involves a defect in perception or cognition, the requested instruction permits the jury to find the defendant not guilty of second degree murder if he was suffering from a mental impairment, defect, disorder, or deficiency so as to be incapable of entertaining malice aforethought, the intent to kill. This adds a third element, defect in volition.

■ The defendant states that the principle embodied in the requested instruction "has been variously referred to as the 'doctrine of diminished responsibility,' 'doctrine of partial responsibility,' 'partial insanity,' and otherwise." But whatever name may be used, in this appeal we take it to mean mental derangement distinguishable from the cognitive insanity as understood in the common law and contemplated by the rule of M'Naghten's Case. The practical result is that in the case of first degree murder the jury could consider defects in the volitional processes to determine the lack of deliberation and premeditation and, as here, in the case of second degree murder, the

lack of malice aforethought necessary to establish the unlawful killing as murder.

Defendant urges that the Model Penal Code of the American Law Institute, by § 4.02(1), Proposed Official Draft, May 1962, supports his position. That section provides:

"Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense."

To determine the propriety of the evidence introduced § 4.02(1) must be examined in the light of § 4.01, "Mental Disease or Defect Excluding Responsibility."

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct *or to*

*conform his conduct to the requirements of law."* [4] (Emphasis supplied.)

Section 4.01 provides, as its first condition, that there is no criminal responsibility where the defendant lacks substantial capacity to appreciate the wrongfulness of his conduct. This is essentially a restatement of the second condition recognized by the Rule of M'Naghten, that the accused did not know he was doing what was wrong. It is the italicized portion of the Model Penal Code which adds a new element heretofore not found in this state; that is, if, because of a mental disease or defect, an accused lacks the capacity to conform his conduct to the requirements of law, he is relieved of criminal responsibility. This test relieves an accused of criminal responsibility for disease or defects in the volitional processes of the human mind whereas M'Naghten relieves of criminal responsibility only if there are defects in the perceptive or cognitive processes.

This is another of the various formulations of the irresistible impulse rule.[5] We

---

4. Proponents of the doctrine argue that the Rule of M'Naghten has not been changed, but we think that if M'Naghten is considered as the test for criminal responsibility by reason of insanity, the rule has been changed.

5. "Irresistible impulse as recognized by the courts is an impulse induced by, and growing out of, some mental disease affecting the volitive, as distinguished from the perceptive, powers, so that the person afflicted, while able to understand the nature and consequences of the act charged against him and to perceive that

it is wrong, is unable, because of such mental disease, to resist the impulse to do it." 14 Am.Jur. 793, § 35.

"Such wording [irresistible impulse] has been criticized by writers insofar as it connotes only, and is limited to spontaneous sudden feeling. Such urges may be the result of long periods of brooding and reflection." Sauer v. United States, 9 Cir., 241 F.2d 640, cert. den. 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539.

The Model Penal Code would seem to embrace not only cases where there is

note that originally an alternative formulation to § 4.01 was submitted in this language:

"A person is not responsible for criminal conduct if at the time of such conduct * * * he * * * is in such state that the prospect of conviction and punishment cannot constitute a significant restraining influence upon him." Model Penal Code, Tentative Draft 1956, Article 4, p. 27.

In the comment to Section 4.01, Tentative Draft of 1956, also is found this statement:

"3. The draft accepts the view that any effort to exclude the non-deterrables from strictly penal sanctions must take account of the impairment of volitional capacity no less than of impairment of cognition; and that this

result should be achieved directly in the formulation of the test, rather than left to mitigation in the application of M'Naghten. It also accepts the criticism of the 'irresistible impulse' formulation as inept in so far at it may be impliedly restricted to sudden, spontaneous acts as distinguished from insane propulsions that are accompanied by brooding or reflection. See e. g., Royal Commission on Capital Punishment, Report (1953) par. 314, p. 110." American Law Institute, Model Penal Code, Tentative Draft 1956, p. 157.

This Court rejected the irresistible impulse rule in State v. Macias,[6] supra. We said:

"The great majority of the states accept the principles laid down in the

the will, an impulse to do an act, but such a case as this where the medical evidence would recognize a total lack of will of any kind; that is, nonwill or non-volition.

6. "The insane irresistible impulse test, let it be emphasized, has never been viewed as a substitute for M'Naghten but only as an additional defense in cases of mental disorder. It was seized upon by some judges with considerable enthusiasm when the idea was relatively new to the profession; in fact in nearly half the states, at least, statements showing some leaning in this direction may be found. On the other hand some of these jurisdictions have rejected this defense after more mature deliberations, as was true in both Pennsylvania and Iowa." Perkins on Criminal Law, Ch. 8, p. 760.

The Supreme Court of Pennsylvania put it this way in Commonwealth v.

Carroll, 412 Pa. 525, 194 A.2d 911, 918 (1963):

"'The Courts of Justice should not abdicate their function and duty of determining criminal responsibility to the psychiatrist. In such event, the test will differ not only with each psychiatrist but also with the prevailing psychiatric winds of the moment. "'* * * Only a short time ago that concept [of irresistible impulse] was emphatically presented as an example of the "uniform" opinion of psychiatrists on criminal responsibility; and yet today, "irresistible impulse" is rejected by most psychiatrists as unsound * * *' [Professor] Hall, 'Psychiatry and Criminal Responsibility,' 65 Yale L.J. 761, 762 (1956)." State of New Jersey v. Lucas, 30 N.J. 37, 152 A.2d 50, 68.'" (Emphasis in original.)

M'Naghten case, supra, as being correct. * * * The majority of the jurisdictions which have adopted a contrary rule apparently base it upon the hypothesis, unworkable practically even if plausible in theory, that the accused may have no power to *act* as between right and wrong, even though he may have *knowledge* thereof." 60 Ariz. 93, 98, 131 P.2d 810, 812.[7] (Emphasis in original.)

■■■■ The defendant urges that the principle enunciated in the Model Penal Code has been accepted by our neighboring state of New Mexico, in State v. Padilla, 66 N.M. 289, 347 P.2d 312, 78 A.L.R.2d 908, and indeed it has. However, New Mexico, prior to Padilla, had committed itself to the irresistible impulse rule. See State v. White, 58 N.M. 324, 270 P.2d 727. Defendant also points to the recent decisions

in the State of California which he urges supports his views. See People v. Gorshen, 51 Cal.2d 716, 336 P.2d 492, and People v. Wells, 33 Cal.2d 330, 202 P.2d 53, cert. den. 338 U.S. 836, 70 S.Ct. 43, 94 L.Ed. 510. California permits the introduction of psychiatric opinion that the accused was suffering from a mental disease or defect negativing a state of mind. It, however, has refused to adopt the formulation of the Model Penal Code, § 4.01, adhering to the M'Naghten Rule as the test for criminal responsibility because of insanity, People v. Nash, 52 Cal.2d 36, 338 P.2d 416, and approving their former opinions holding that if M'Naghten is to be changed the arguments should be made to the legislature rather than the courts. Whatever may be the theoretical merits in the medical evaluation of the volitional aspects of the human mind, we, like California, do not accept § 4.01 of the Model Penal Code as the test

7. The problem of want of criminal responsibility from the standpoint of the volition is subject to the criticism advanced by Jerome Hall in "Mental Disease and Criminal Responsibility," 45 Columbia Law Review 677, from which we quote at page 682:

"But many of the most important advances have been made in psychiatry, which is especially important in the criminal law. Dissension here, however, is more acute than elsewhere, and the validity of this branch of psychology is no less challenged. 'The best psychiatry is still more of art than of science,' writes a recognized expert. 'There are, in fact, many methods, standpoints, views and convictions which are all at war with one another,'

states Jung; and these limitations are regularly reflected in enormous divergencies in diagnosis. A competent practitioner admits 'the debatable character of many theories,' while a forthright investigator concludes that 'no critically minded person practiced in scientific research or in disciplined speculation can accept psychoanalysis on the basis of the writings of Freud or of any of his followers. The presentation of facts is inadequate; the speculation is irresponsible; verifications are lacking; conclusions are hastily arrived at, and concepts are hypostatized.' Finally, it is admitted that, with some exceptions, 'there has been no real psychiatric insight into criminalistic behavior.' "

for criminal responsibility in this state. This brings us to the reasons we reject the defendant's requested instruction No. 30.

 As stated, the legislature has laid down a complete system to determine the unlawfulness of a killing and punishment dependent upon the circumstances surrounding the commission of the act. The defendant argues that if the jury had been instructed in accordance with his requested instruction, it could have appropriately reduced the offense of second degree murder to that of manslaughter.[8] By A.R.S. § 13–451, where the killing is unlawful, malice is express "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature" and *"It is implied when no considerable provocation appears* or when the circumstances attending the killing show an abandoned and malignant heart." (Emphasis supplied.) Malice may even be implied where an actual intent not to kill exists; as for example, where a shot is fired into another's leg with the intent to do bodily harm. If the person dies, as from blood poisoning, and there was no adequate provocation for the shot, it is murder. So it has been held that one who chokes another with no in-

8. We note this statement from Weihofen's "Mental Disorder as a Criminal Defense," pp. 189, 190:

"*Mental Disorder Affecting Provocation.* Still another theory that would operate to punish offenders suffering from certain types of minor disorders less severely than normal persons is based upon the rule recognizing heat of passion as a mitigating circumstance in homicide. It is the general rule that heat of passion, induced by provocation sufficient to arouse the passion of a reasonable man, will reduce a homicide from murder to voluntary manslaughter. This rule, unlike the one just discussed, is truly a rule of mitigation. Heat of passion reduces the crime because 'the law, out of indulgence to the frailty of human nature, or rather, in recognition of the laws upon which human nature is constituted, very properly regards the offense as of a less heinous character than murder, and gives it the designation of manslaughter.'

"It has been suggested that the heat of passion rule should be liberalized so as to take account of the abnormal irritability of neurotic and other disordered offenders who are not so insane as to be irresponsible. In other words, the adequacy of the provoking circumstances should be judged not merely by an objective standard of reasonableness, but also by the subjective reaction of the individual to those circumstances, so that the same objective irritation which may not be sufficient to provoke a reasonable man may nevertheless be held sufficient in the case of certain psychotic or neurotic individuals.

"This theory has been accepted in Tennessee, but it has been rejected elsewhere in the United States and in England.

 * * * * *

"The reason courts have given for refusing to take into consideration abnormal irritability and passion, caused by mental disorder, is that the standard by which the law judges the adequacy of the provocation, is wholly objective. In order to reduce the crime from first degree murder to some lesser offense, the provocation, as has already been said, must be such as to arouse the passion of a reasonable man. The peculiar temperament and idiosyncracies of the defendant are not considered."

tention to kill is guilty of second degree murder where death unintentionally results. Commonwealth v. Marshall, 287 Pa. 512, 135 A. 301.

The legislature has provided that malice shall be implied where there is an unlawful killing with no considerable provocation. It has not recognized a disease or defect of mind in which volition does not exist—even if some psychiatrists do—as a defense to a prosecution for murder. Volition, the ability to determine or choose a course of action, is implied and the killing can be manslaughter only if it is established that the will not to kill has been overcome by adequate provocation.

To instruct as defendant proposes would present conscientious jurors with an almost unresolvable dilemma. If they found the facts to be that there was no considerable provocation sufficient to reduce the crime to manslaughter, they would, under the law of this state, be required to find malice and return a verdict of guilty of second degree murder, but the evidence is from credible medical experts that defendant cannot be guilty of second degree murder because there was in fact no malice. (Nor could the jury return a verdict of manslaughter because the circumstances of the killing did not present adequate provocation.) Jurors are thus put to this choice: Either to violate their oaths as jurors and disregard the law returning a verdict of not

guilty; or close their minds to the evidence of the accused's principal and perhaps only defense, evidence they may honestly believe, and return a verdict of guilty.

Section 4.02(1), relied on by the defendant as the basis for his requested instruction No. 30 is part of a comprehensive scheme established by Article 4 of the Model Penal Code (Proposed Official Draft, May, 1962). The code reflects the considered judgment of some of the best informed men of this country. Among other things, Article 4 provides that whenever the defendant has filed a notice of intention to rely on the defense of mental disease or defect excluding responsibility, the court shall appoint at least one qualified psychiatrist to examine and report upon the mental condition of the defendant and to that end he may be committed to a hospital for the purpose of the examination for a period up to sixty days. See § 4.05. By § 4.08, when a defendant is acquitted on the ground of mental disease or defect excluding responsibility, the court shall order him committed to custody in an appropriate institution for care and treatment from which he may only be released when he is without danger to himself or others.

We are satisfied that Article 4 represents a desirable approach to the handling of mental defectives with criminal tendencies but it is obvious that this Court does not have the authority under the Constitution of the state to promulgate it as

the law of this jurisdiction. We are hesitant about adopting portions piecemeal. As is illustrated by the problem arising in this case: If we accept defendant's proposal and decide that psychiatric evidence of a mental disease or defect is relevant to prove that a defendant did not have a state of mind which is an element of the offense, the jury would be put to the compulsion of releasing upon society many dangerous criminals who obviously should be placed under confinement.

We conclude the court below did not err in refusing the defendant's requested instruction.

Defendant assigns as error the admission of testimony of one Dr. Paul Bindelglas, a psychiatrist. Prior to the trial, the State made a motion requesting the court to allow two state psychiatrists to examine the defendant. On the day set for the hearing of the motion, the county attorney withdrew it apparently recognizing that there was no authority for such action.[9] On the same day, Dr. Bindelglas was sent to the defendant's home by the county attorney without notice to the defendant or his counsel.

Thereafter, he was called as a witness at the trial on rebuttal and testified as follows:

"Q BY [PROSECUTING ATTORNEY]: You went for the purpose of performing a psychiatric examination?

"A Yes.

"Q Did you ask him to take a psychiatric examination?

"A Yes.

"Q And did you tell him you were from the County Attorney's office?

"A Yes, I did.

"Q And did he agree to a psychiatric examination?

"A He did not."

The defendant objected to the testimony of Dr. Bindelglas "on the basis that the refusal by the defendant to permit the examination is immaterial, irrelevant to any issue in this case, that it does not tend to prove or disprove any fact or issue in this case, * * *." Defendant continues here to argue that the refusal of the psychiatric examination has no possible materiality or relevancy to the issue of sanity, but we think otherwise.

There is an inference arising out of the failure of the State to call expert medical witnesses in rebuttal that the defendant's evidence as to insanity is true

9. About seven months later, in an opinion dated July 3, 1963, this Court decided that there was no statutory or inherent power in the trial court to compel a defendant to submit to a compulsory mental examination. Steward v. Superior Court of Maricopa County, 94 Ariz. 279, 383 P. 2d 191.

because uncontradicted. We are of the view that where a defendant files a notice of reliance on insanity and thereafter offers expert testimony based upon an examination to which he submittted himself the refusal of an examination by competent medical experts representing the State may be shown to negative that inference. In holding this was not error, we do not wish to approve the tactics of the county attorney in sending a psychiatrist to the defendant's residence unknown to defendant's counsel.

■ Defendant further urges, assuming that the foregoing evidence was properly admitted, that he should have been allowed to rebut it. Defendant proposed to establish on surrebuttal by recalling Dr. Tuchler that two doctors, qualified medical experts in the field of psychiatry, were present in the courtroom when the defendant testified on direct examination, cross-examination and during his examination. It is defendant's position that this testimony should have been admitted for the limited purpose of refuting the inference of Dr. Bindelglas's testimony that the State was not afforded the opportunity of examining the defendant in order to refute Dr. Tuchler's testimony. We presume at this point that the State was attempting to follow the procedures found acceptable in State v. Burgunder, supra. There the State's medical expert sat in the courtroom and then testified that he was able to con-

clude the defendant was sane at the time of the commission of the act.

■ The inference sought to be drawn from the presence of two doctors, psychiatrists, in the courtroom is highly speculative. It is within the discretion of the trial court to refuse to admit the proposed evidence from which the inference is sought to be drawn. A statement of the proper rule is appropriately set forth in Smitherman v. State, 33 Ala.App. 316, 33 So.2d 396, where the court approved the quotation from an earlier Alabama case as follows:

> " 'As a general rule, facts are deemed relevant which logically tend to prove or disprove the fact in issue, or which afford a reasonable inference or shed light upon the matter contested; and facts bearing so remotely upon or collaterally to the issue that they afford merely conjectural inference concerning the facts in issue should not be admitted in evidence.' " 33 So.2d 396, 398.

The proposed testimony of Dr. Tuchler would, at most, raise only conjectural inference of the facts sought to be established. The proper method would have been to call as witnesses the two doctors to testify whether they did or did not have a sufficient opportunity to form an opinion concerning the defendant's mental capacity at the time of the act.

Finally, defendant argues that the court below should have granted a mistrial based on improper arguments of the deputy county attorney. Defendant first points to this argument:

"And I ask you on behalf of the people of the State of Arizona to return a verdict of guilty of second degree, murder in the second degree, *because you, ladies and gentlemen, establish the standard in this community by which we shall live.*

"It is not the lawyers. It is not the judges. It is not the police. The police just get the evidence. It is not the law. The law is just a book, it is on paper. The law never comes alive and becomes applicable until you take and apply it." (Emphasis supplied.)

At this point, counsel for defendant objected, assigning as his reason that the jury "is not to set a standard in the community" and the court sustained the objection. This, of course, in effect, told the jury that the deputy county attorney was incorrect in his argument on the point to which the court sustained the objection. Immediately thereafter, counsel concluded his argument with this statement, thereby plainly clarifying and limiting the meaning of his prior statements:

"Ladies and gentlemen, it is not the police that enforce the law. They make the investigations. It is not the lawyers. It is not the judges. It is you that enforces the law and makes it applicable to specific situations, because until you enforce the law, it is just a piece of paper in the books, and it is just something that the lawyers study in law school. It has no meaning until you take that law and apply it.

"The State is asking you to do that in this case. Thank you."

We do not believe that prejudice to the defendant could have resulted from this incident.

Second, the defendant relies upon these statements of the assistant county attorney:

"Now, ladies and gentlemen of the jury, at the beginning of the case I told you the State would prove one of the most brutal and vicious killings in the history of Maricopa County, and Mr. Flynn said it wasn't so, but I daresay, we have proved one of the most brutal and vicious killings, *and I refer to the pictures that he tried so desperately to keep out of evidence.*

\* \* \* \* \* \*

"The pictures speak for themselves. *You remember the desperate effort made by the attorney to keep the pictures out, pictures of the body?*" (Emphases supplied by defendant.)

We do not believe that these quoted remarks were prejudicial since the jurors were present and could determine for themselves the validity of the statements. Counsel are permitted some leeway in their summation of the case to the jury.

■ For a like reason, the assistant county attorney's comments that the defendant impressed him "as a man who could turn his memory off and on" and, "he doesn't remember what he doesn't want to. He is crazy. He is crazy like a fox," are obviously but reflection of a personal opinion and must have been understood by the jury as such.

For the foregoing reasons, the judgment and sentence of the court below are affirmed.

LOCKWOOD, C. J., and BERNSTEIN, J., concur.

McFARLAND and UDALL, Justices (specially concurring).

We concur in the results reached in the opinion of the majority, and in the opinion itself, except as to the discussion of the recommendations of the American Law Institute as contained in its "Model Penal Code" (proposed official draft May 1962). We do not consider this part of the opinion essential to the result reached by the majority.

There has been a great deal of study, and much written, on mental diseases as a defense for crime, including that of the American Law Institute, all of which are deserving of consideration. This court has consistently held the M'Naghten's rules provide the best test available. State v. Preis, 89 Ariz. 336, 362 P.2d 660; State v. Crose, 88 Ariz. 389, 357 P.2d 136; State v. Eisenstein, 72 Ariz. 320, 235 P.2d 1011. We feel the majority were correct in refusing to change the M'Naghten rule, but we do not concur in the statement that "We are satisfied that Article 4 represents a desirable approach to the handling of mental defectives with criminal tendencies * * *." In our opinion, a careful study would have to be made as to how any of the proposals would fit our system in Arizona before a determination could be made as to whether a different system would be more desirable than the one we now have. As stated by the majority, in a well-written and scholarly opinion, this is a legislative responsibility.