Matthew D. DUKES, Appellant,

v.

The STATE of Oklahoma, Appellee.

No A–15771.

Court of Criminal Appeals of Oklahoma.

June 28, 1972.

Leo Thompson, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Nathan J. Gigger, Asst. Atty. Gen., for appellee.

SIMMS, Judge:

Matthew D. Dukes, appellant, hereinafter referred to as the defendant, was convicted in the District Court of Oklahoma County, Oklahoma, of the crime of Murder, and was sentenced to a term of Life Imprisonment in accordance with the jury verdict. From the judgment and sentence, defendant has perfected a timely appeal to this Court.

Evidence adduced at trial showed that defendant, on August 1, 1964, called a taxi-cab to his residence at the Tower Apartments, N. W. 9th and Robinson, Oklahoma City, and rode in the cab to the home of his former wife, which was located in Midwest City. The evidence further indicated that the former wife of defendant had re-married Walter Graham Harding.

When defendant arrived at the home of his former wife and her husband in Midwest City, Harding and defendant's former wife were sitting on the front porch of the home. Defendant got out of the cab and walked toward the front porch of the residence carrying in his belt, underneath the shirt, a .22 cal. revolver. As defendant proceeded toward the front porch of the home being occupied by deceased and his wife, the deceased, Harding, got out of a chair and started in the front door of the house. Harding then turned around at which point, defendant emptied the gun in the direction of Harding, striking Harding four times, causing Harding's death.

After defendant had shot and killed Harding, he put the death weapon in his pocket and started in the direction of the Midwest City Police Station. On his way to the station, defendant was arrested by Midwest City Police Officers.

Further evidence was introduced to show that on or about July 17th or 18th, defendant had gone to the home of his former wife, where he observed his former wife in bed with Harding, and they were drinking a fifth of whiskey. At that time, an altercation occurred in the house between the defendant and Harding. An assault charge against defendant arose out of this incident.

Defendant, testifying in his own behalf, admitted that he had, following the July incident, purchased the .22 cal. death weapon; admitting as well, the shooting of deceased on the day in question, and testified that he disapproved of the treatment of his natural sons by the deceased. Defendant further testified that he was fearful of what Harding might do in the event of a confrontation, by reason of a threat communicated to the defendant by Harding following the July 17th or 18th incident.

The principal theory of defense was temporary insanity.

The record reflects that defendant had served a term in the United States Navy from October 2, 1945, until February 19, 1949. Defendant, according to the transcript, re-enlisted in the Marine Corps in September, 1950, and was thereafter sent to Korea. As a result of a military engagement in the Korean conflict, defendant received a head wound causing the loss of one eye and brain damage.

The record further reflects that defendant, because of his valor in the military engagement, was awarded the Navy Cross, and in addition thereto, holds the Purple Heart.

In support of the theory of defense, temporary insanity, defendant presented as one of his witnesses, Dr. Cecil Childers, a psychiatrist of Corpus Christi, Texas. Dr. Childers had formerly been employed at the Veterans Administration Hospital in Oklahoma City, and the University of Oklahoma Medical Unit. Dr. Childers described the nature and effect of the bullet wound defendant had received in Korea, and testified that defendant suffered "temporal lobe epilepsy" which was comparable to "petit-mal seizures" when the patient doesn't lose consciousness; but he testified that on occasions, the defendant had in the past lost consciousness.

The medical expert further testified that on the day in question, defendant could have experienced temporary insanity, but the expert was unable to say whether or not he did. (Tr. 74) The doctor stated, however, that he did not consider the defendant to be psychotic. (Tr. 79)

Other witnesses were called to testify as to defendant's expressed concern over the treatment his sons were receiving at the hands of his former wife and their step-father. Also, testimony was forthcoming from witnesses that defendant was a rather eccentric person and had done such things as attempt to get assistance from the Secretary of War, the Secretary of the Navy, the President of the United States, and on one occasion, had attempted to personally contact the then Governor of the State of Oklahoma over a grievance defendant had.

Additional evidence, in support of defendant's theory of defense, was that in 1949 defendant was hospitalized in a State Mental Institution from which he walked away.

■ Defendant first asserts in his brief, that the trial court committed error when the Judge denied defendant a separate jury trial on the issue of his present sanity.

The controlling statute is 22 O.S.1971, § 1162, which reads as follows:

"When an indictment or information is called for trial, or upon conviction the defendant is brought up for judgment, if a doubt arise as to the sanity of the defendant, the court must order a jury to be empanelled from the jurors summoned and returned for the term, or who may

be summoned by direction of the court, to inquire into the fact."

In the case at bar, prior to the empanelling of a jury to try the issue of guilt or innocence, defense counsel made a timely demand for a separate jury to try the issue of present sanity. The state objected to the calling of a separate jury, whereupon the trial court sustained the objection by the state and made the following observation:

"The Court finds that on September 29, 1969, that the defendant by and thru his attorney, Leo Thompson, applied for psychiatric examination and thereafter on the 3rd day of October, 1969, the defendant was committed to the Eastern Hospital at Vinita, Oklahoma, not to exceed sixty days by Judge Charles Owens; that thereafter on the 4th day of November, 1969, that D. H. Peterson, M.D., Superintendent of the Eastern State Hospital at Vinita, Oklahoma, reported to the court that in the opinion of the staff at the hospital, the defendant was 'not psychotic at this time and is able to distinguish between right and wrong and we feel he would be able to adequately assist legal counsel in his own behalf'; and that previously on the 3rd day of August, 1964, the defendant, Matthew D. Dukes, had previously been ordered to Eastern State Hospital at Vinita, Oklahoma for observation and examination and at that time he was found by the staff at said hospital to be 'not psychotic at this time and we feel that he does know the difference between right and wrong and could adequately aid legal counsel in his own defense.' The court having observed the defendant and having heard the motion is of the opinion it would serve no useful purpose to grant defendant jury trial on the question of his present sanity."

Unquestionably, if a doubt had arisen in the mind of the trial court, there was a mandatory duty to have a hearing on the question of the present sanity of defendant. Tuggle v. State, 73 Okl.Cr. 208, 119 P.2d 857 (1941).

This Court, however, held in Johnson v. State, Okl.Cr., 448 P.2d 266 (1969), opinion by Brett, Judge:

"It is not error for the trial judge to deny a jury hearing as to sanity when court has received medical certification from State Hospital Doctor that the defendant is sane according to law, in absence of overwhelming evidence to the contrary."

Likewise, in French v. State, Okl.Cr., 397 P.2d 909 (1964), this Court held that a denial of defendant's request for jury trial on issue of sanity prior to trying him on murder charge was not arbitrary, where the defendant had twice been sent to a State Hospital for observation and had been found competent to assist in his defense and had been observed personally by the trial court. It is to be noted that throughout the examination of defense witnesses by counsel of defendant's own choosing, he continually referred to past episodes and repeatedly attempted to establish a defense of temporary, as opposed to present, insanity. An examination of the record in the case, particularly the instructions given by the court, indicate that the jury was properly and thoroughly instructed upon the defense of temporary insanity.

The cases relied upon by defendant in support of his first enumerated proposition are vitally different from the case at bar.

We therefore conclude that defendant's first proposition of error is wholly without merit.

█ The defendant next contends that the trial court abused its discretion in denying him a continuance for producing a subpoenaed witness and in denying admission of the material testimony of Clay Sheid.

It appears from the record that General Clyde Watts had been subpoenaed on behalf of the defendant to testify at the trial. The record further indicates that General Watts was out of the state at the time of trial and therefore, could not attend as a

witness. At pages 123, 124, of the trial transcript, the following occurred:

"MR. THOMPSON: Comes now the defendant and moves the court to recess until Clyde J. Watts, a witness subpoenaed, appears. The defendant believes that the witness, Clyde J. Watts, is a material witness and necessary to our defense.

THE COURT: What will he testify to?

MR. THOMPSON: He will testify that he has known the defendant personally for over fifteen years, that he has talked to him about the problems of his children, not as an attorney but as a friend, he has observed his mental capacities; he has observed his actions; and he knows probably as much about him as any other man in Oklahoma City.

MR. CUNNINGHAM: If you wish to read that to the jury, we will stipulate that is what he will testify to."

The testimony of the witness, looking at the same in the best light for the defendant, would have, at most, been cumulative in nature, for other witnesses testified to the same matters.

Furthermore, in the case of Allcorn v. State, Okl.Cr., 392 P.2d 66, (1964), this Court held in syllabus one:

"The granting or denial of a Motion for Continuance filed on the day of trial, rests within the sound discretion of the trial court. The action of the trial court in denying a Motion for Continuance will not be disturbed on review unless it can be shown that the action of the trial court was arbitrary and capricious."

As well, in Pitts v. State, Okl.Cr., 431 P.2d 449 (1967), this Court held at page 452:

"This Court has held numerous times that it is within the discretion of the trial court whether or not, to permit a continuance on defendant's motion. This is especially true when this motion is offered on the date set for trial. See: Winfield v. State, 18 Okl.Cr. 257, 191 P. 609; Jackson v. State, 72 Okl.Cr. 226,

114 P.2d 953 (1941). It is never required that the defendant produce any witnesses at all. That decision is made by the defendant and his legal counsel alone. In this case, *the testimony of Wilma Jones would have been only cumulative to that of the witnesses offered; and this Court has repeatedly held that it is not error to refuse a continuance when the evidence sought to be admitted would be merely cumulative.* See citations above." (emphasis added)

Based on the above cited authority, we find the trial court did not abuse its discretion in refusing defendant's request for a continuance.

Defendant called Mr. Clay Sheid, Chief of the Capitol Police, as a witness to testify in his behalf. Chief Sheid testified he had received several complaints concerning the activities of Mr. Dukes and did a follow-up investigation. (Tr. 84) However, Sheid testified that he had never seen the defendant. The witness, however, had prepared a written investigative report and submitted the same to an administrative staff officer in the Governor's office in 1964.

The trial court refused to permit defendant's introduction of the investigative report into evidence. Defendant cites no authority in support of his proposition and we held in Sandefur v. State, Okl.Cr., 461 P.2d 954 (1969):

"It is necessary for counsel for plaintiff in error not only to assert error, but to support his contentions by both argument and the citations of authorities. Where this is not done, and it is apparent that the defendant has been deprived of no fundamental rights, this court will not search the books for authorities to support the mere assertion that the trial court has erred."

██ Notwithstanding our pronouncement in *Sandefur*, supra, it has long been the law of the State of Oklahoma that hearsay police reports, based upon information furnished by third persons are inadmissible in evidence in the trial of a

case. See, Weeks v. State, 88 Okl.Cr. 291, 202 P.2d 1005 (1949).

It was, therefore, not error on the part of the trial court to exclude the officer's report from evidence.

Defendant's third specification of error is directed at the trial court's refusal to permit defendant's doctor to identify and introduce into evidence certain medical records containing a history of the defendant. These records were referred to generally as medical "work-ups". These specified records were prepared by Dr. Childers, who testified at length in behalf of the defendant.

■ In support of this third specification in error, defendant cites 120 A.L.R. 1129. We have scrutinized this citation and agree, generally, with the proposition which is set forth therein; that hospital records kept in the ordinary course and conduct of business are admissible in a criminal case if a proper foundation is laid for the admission of the hospital records. The question of receiving in evidence in a criminal case, written reports of psychiatric examinations is also treated at 32 A.L.R.2d 452.

It is to be emphasized that no authority is cited for the proposition that where the defendant calls his own psychiatrist to testify, that the testimony containing the expert opinions of the psychiatrist may be bolstered by the introduction into evidence of written reports.

We can only conclude, after carefully reviewing the testimony of Dr. Childers, that the admissibility of his "work-ups" would be merely cumulative in nature and, if in fact the refusal constituted error, such error at most would be harmless in nature. We therefore find defendant's third contention of error, likewise, to be without merit.

■ In his reply brief, defendant asserts as proposition one: "Notwithstanding the arguments offered by the State, the plaintiff in error's mental condition was sufficient to reduce the charge to First Degree Manslaughter." Defendant cites no perti-

nent authority in support of this proposition and we are unable, after exhaustive research, to find authority in support of this assertion.

On the contrary, we find in Foster v. State, 37 Ariz. 281, 294 P. 268 (1930), the following language:

"We can see no reason for submitting the issue of second degree murder or manslaughter to the jury when the evidence conclusively shows defendant guilty of the highest degree of the crime or not guilty at all by reason of his insanity. There is no middle ground in such case, no evidence tending to show the lower degree of murder or manslaughter."

The language used by the Arizona Court was adopted in this State in Dare v. State, Okl.Cr., 378 P.2d 339 (1963), page 349.

In the case at bar, defendant admitted the homicide, and chose as his theory of defense "temporary insanity." It would not have been error for the court to have refused an instruction upon manslaughter in the first degree. Defendant may not be heard to complain by reason of the court's failure to reduce the charge to first degree manslaughter.

■ The proposition enumerated "II" in defendant's reply brief is, "can a person with a deluded mind form the premeditation required to constitute the crime of murder?"

Again, defendant cites no authorities in answer to his proposition, however, this question pre-supposes a finding on the part of the jury that the defendant was, in fact, insane or suffering a deluded mind.

In Kennamer v. State, 59 Okl.Cr. 146, 57 P.2d 646 (1936), this Court held, in syllabus seventeen:

"An insane delusion is not a defense to a prosecution for crime, unless it would excuse the crime if the facts about which it exists are true."

Again, the question of temporary insanity was presented to the jury under proper

instructions, and we held in Jones v. State, Okl.Cr., 479 P.2d 591 (1971), in syllabus number two:

"On murder prosecution, the question of insanity at the time of the commission of the crime, presents a question of fact for the sole determination of the jury, and where there is any evidence tending to support the finding it is not the province of the appellate court to weigh the same."

Also, in *Jones*, supra, syllabi three reads as follows:

"Sanity being the normal and usual condition of mankind, the law presumes that every person is sane; the State in a criminal prosecution may rely upon such presumption without proof relative thereto."

▮ Lastly, defendant contends the punishment assessed by the jury was excessive. The defendant, admittedly, armed himself and went to the home of the deceased, where defendant—without provocation— emptied a revolver at the deceased. We cannot say a life sentence shocks the conscience of this Court. As we said in Roberts v. State, Okl.Cr., 473 P.2d 264 (1970):

"A judgment and sentence will not be modified unless it shocks the conscience of this Court."

Also, in Ransom v. State, Okl.Cr., 453 P.2d 301 (1969), we held the Court will not modify a sentence unless it is so excessive as to shock the conscience of the Court.

Having examined, most carefully, the briefs and the entire transcript of evidence, we find no error was committed during the trial of the case and, therefore, the judgment and sentence of the trial court will, in all respects, be affirmed.

BUSSEY, P. J., concurs.

BRETT, J., not participating.