DUTCHESS OYER AND TERMINER, April, 1848.    *Barculo,* Justice.

### THE PEOPLE *vs.* WESLEY PINE.

How far the jury, in criminal cases, are judges of the *law* as well as of the *facts*.

Rules of law applicable to the defence of *insanity*, in criminal cases.

A man is not responsible for an act when, by reason of involuntary insanity or delusion, he is, at the time, incapable of perceiving that the act is either wrong or unlawful.

THE defendant was indicted for the murder of Mrs. Russell, and pleaded not guilty. He was tried at the oyer and terminer in Dutchess county, in April, 1848, before Justice Barculo. The following is the *charge* to the jury given by the judge. The facts of the case, so far as they bore upon the defence of *insanity* set up by the prisoner, sufficiently appear from the charge.

BARCULO, J. Gentlemen of the jury : The solemn duty of deciding upon the guilt or innocence of the prisoner at the bar, now devolves upon you. The importance of your verdict to him, as well as its influence and effect upon the interests of society, requires at your hands a careful and thorough examination of the evidence. If he be innocent, let him go free. But if he be guilty, let him not escape the punishment due to his crime, by your want of firmness, nor by reason of your shrinking from the faithful discharge of your sworn duty. You are merely to answer to the question of guilt or innocence ; you have nothing to do with the *consequences* of your decision. They rest with the legislature who made the law, and upon the head of those who violate it. Not, gentlemen, that I would intimate the slightest doubt of the wisdom and justice of the law which inflicts capital punishment for the crime of murder. On the contrary, we hold it to be an incontrovertible proposition, that society has the undoubted right to make such laws as are necessary for the protection of its members ; that the same principle which will justify us in depriving the thief of his *liberty*, will justify us in depriving the murderer of *life ;* that the experience of civilized nations in all ages has demonstrated the wisdom and policy of the doctrine ; that it accords with the principles of human nature, and the dictates of human reason ; nay, more—that it is sanctioned by divine authority itself, in the declaration that " whoso sheddeth man's blood, by man shall his blood be shed."

In the case before you, gentlemen, you are not embarrassed with those questions which usually most perplex juries in capital trials. There is no doubt that the prisoner perpetrated the

homicide—that his hand discharged and directed the fatal shot which occasioned the death of Mrs. Russell.

The case turns upon the defence of insanity set up on behalf of the accused. It is the duty of the court to lay before you the legal principles applicable to cases of insanity, in order that you may apply them to the facts; and it is your duty to take those principles as delivered to you, and so apply them. It is often said, and has been said in the progress of this trial, that the jury in criminal cases, are judges of the *law*, as well as of the facts. If by this is meant that the jury are to assume the prerogative of the court as exercised in civil cases, adopt their own views of the law without regard to those entertained by the court, I am bound to say to you, that such is not the law of the land. This proposition is perfectly untenable, and has been distinctly repudiated on more than one occasion by the judges of the supreme court of the United States. If, however, by this expression is meant merely that whatever decision the jury make, whether of law or fact, in favor of the prisoner, is final and cannot be reviewed—then the declaration is true. This is all that can be properly understood by the phrase " the jury are judges of the law as well as fact;" and the reason of this is, that the constitution does not permit a new trial in case of acquittal. But if the decision of the jury should be *against* a prisoner, contrary to the law as laid down by the court, a remedy can be applied. In this state the jury is presumed to receive the law from the court. The prisoner has the benefit of exceptions to the opinion of the court; and if they are well founded, he can obtain a new trial. The jury, it is true, have the *power* to disregard the law, and to disregard their oaths— and to render a verdict contrary to both law and evidence; and in this respect they are the judges of the law; and if in so doing they acquit a prisoner when he is guilty, the public is without redress. But it can hardly be contended that the jury has the *right* to do all this. This question has recently been discussed and decided by the supreme court of the state of Massachusetts, in the case of the *Commonwealth* v. *Porter*, (*Law Rep. for* 1847, *p.* 455.) In delivering the opinion of the court,

Chief Justice Shaw makes the following observations: "We consider it a well settled principle and rule, lying at the foundation of jury trial, admitted and recognized, ever since jury trial has been adopted as an established and settled mode of proceeding in courts of justice, that it is the proper province and duty of judges to consider and decide all questions of law, which arise, and that the responsibility of a correct decision is placed finally on them: that it is the province and duty of the jury to weigh and consider evidence, and decide all questions of fact, and that the responsibility of a correct decision is placed upon them. And the safety, efficacy, and purity of jury trial depend upon the steady maintenance and practical application of this principle. It would be alike a usurpation of authority and violation of duty, for a court on a jury trial, to decide authoritatively on the questions of fact, and for the jury to decide ultimately and authoritatively upon the questions of law." "This, as a *general* principle, is applicable alike to civil and *criminal* cases." "It is presumed that the jury followed the instruction of the court, in matter of law, because it was their duty so to do, and therefore if the instruction was wrong the verdict was wrong." "It is the duty of the court to instruct the jury on all questions of law which appear to arise in the cause, and also upon all questions pertinent to the issue, upon which either party may request the direction of the court, upon matters of law. *And it is the duty of the jury to receive the law from the court, and to conform their judgment and decision to such instructions,* as far as they understand them, in applying the law to the facts to be found by them; and it is not within the legitimate province of the jury to revise, reconsider, or decide contrary to such opinion or direction of the court in matter of law. To this duty, jurors are bound by a strong social and moral obligation, enforced by the sanction of an oath, to the same extent, and in the same manner as they are conscientiously bound to decide all questions of fact according to the evidence." A similar doctrine was held by the late Judge Story, whose fame as a jurist has extended far beyond the limits of his own country. He stated it as the opinion of his whole pro-

The People *v.* Pine.

fessional life, that the jury are no more judges of the law in a capital or other criminal case, upon the plea of not guilty, than they are in every civil case tried upon the general issue : that in each case, they had the physical, but not the moral right to decide the law according to their own notions or pleasure ; that it is the duty of the court to instruct them as to the law ; and of the jury to follow such instructions. ( *United States* v. *Battiste,* 2 *Sumn.* 240. *Townsend* v. *The State,* 2 *Blackf.* 156. *Cowen & Hill's Notes,* 1501. *United States* v. *Wilson and Porter,* 1 *Bald. Rep.* 78.)

The question of insanity, upon which this case turns, always invokes difficult and intricate inquiries. It is a subject upon which much has been said and written, by way of theory and speculation, and it cannot be denied that the numerous adjudications are not altogether reconcilable. Without detaining you with technical terms, it will be sufficient to say that insanity assumes a variety of forms, and has many names. Among these are—1. General insanity ; 2. Partial insanity ; 3. Periodical insanity ; 4. Moral insanity ; 5. Drunken insanity. The first is insanity applied to objects generally. The second is applied to single objects. The third occurs at periods, with sane intervals. The fourth is a morbid perversion of the natural feelings, affections, &c. and the fifth is that which results directly from intoxication. Now the rules applicable to crimes committed in any of these degrees of insanity, are mainly those of sound reason. Thus it is conceded to be the law, that insanity occasioned directly by intoxication, is no excuse for a crime committed by one in that state. If it were otherwise, a man by drinking to excess could divest himself of legal responsibility and gratify his thirst for vengeance with impunity. In regard to the other kinds of insanity, the rule is laid down in great variety of terms. The English rule is thus stated in Bellingham's case, by Chief Justice Mansfield—" In order to support the defence of insanity, it ought to be proved by the most distinct and unquestionable evidence that the prisoner was incapable of judging between right and wrong ; that in fact it must be proved beyond all doubt that at the time he committed

*The People v. Pine.*

the atrocious act with which he stood charged, he did not consider that murder was a crime against the laws of God and nature." As long as they could distinguish good from evil, they would be amenable for their conduct. Lord Lyndhurst, in *Rex v. Offord*, put this question—"Did the prisoner know that in doing the act, he offended against the laws of God and man?" According to the Scotch rule, the insanity must be of such a kind as entirely to deprive the prisoner of the use of reason, *as applied to the act in question*, and the knowledge that he was doing wrong in committing it. If, though somewhat deranged, he is able to distinguish right from wrong, *in his own case*, and to know that he was doing wrong in the act which he committed, he is liable to the full punishment of his criminal acts.

In the case of *Abner Rogers*, tried in Massachusetts before Chief Justice Shaw, in 1844, he laid down the rule as follows: " A man is not to be excused from responsibility if he has capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he is then doing; a knowledge and consciousness that the act he is doing is wrong and criminal, will subject him to punishment." Although he may be laboring under partial insanity, if he still understand the nature and character of his act, and its consequences; if he has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and receive punishment; such partial insanity is not sufficient to exempt him from responsibility for criminal acts."

There are cases in which the insanity consists in a delusion by which the prisoner has a real and firm belief of the existence of a fact wholly imaginary and unfounded. In regard to this, the English courts hold that it is no defence for a crime that the prisoner supposes he is redressing an injury or grievance. The Massachusetts rule is, that if the *imaginary facts* would, if *true*, justify the act, then he is excusable. As, when the prisoner supposed that the person was about to kill him, and he slays the other in self defence. There must be an *immediate apprehension* of danger.

The People *v.* Pine.

Applying this principle to the present case : if the prisoner really believed that Mrs. Russell was in the act of committing a great personal injury to him, and supposed that he shot her in self defence, he would be excusable. But it would be no defence, that the supposed Russell or his wife had *injured him to any extent,* because if it were *true,* it would be no justification of the act. If a breach of promise or any thing of that kind was the origin of the act, and this was done by way of revenge, he is not excusable. A simple and sound rule may be thus expressed—a man is not responsible for an act when, by reason of involuntary insanity or delusion, he is at the time incapable of perceiving that the act is either wrong or unlawful. Keeping in mind this rule, let us look into the testimony, and endeavor to apply it. It arranges itself in two kinds : 1. Hereditary insanity ; 2. Personal acts of insanity.

As to hereditary insanity, the evidence is admissible upon that principle of human nature by which the properties, temperaments and infirmities of the parents are sometimes transmitted to their children, and pass from generation to generation. It is not in any case evidence of the highest character. It would be obviously unsafe to acquit any prisoner on the *sole* ground that any of his ancestors were *insane.* It is a mere *circumstance.* But before any inference can be drawn from such a source, the fact of the ancestor's insanity must be clearly established. It is endeavored to be shown from the following facts that the prisoner's father was insane : 1. He appointed a time to die; 2. Was troubled in mind; 3. Committed suicide. But do these acts necessarily prove insanity ? He seems to have been a "high spirited" man, and possessing strong passions and religious feelings. He was unfortunate in his pecuniary affairs—his property about to be sold on execution. May not these facts account for his conduct ? Is every man who becomes possessed with the idea that he is about to die, insane ? Is *suicide* evidence of insanity ? Clearly not, alone. If you were now trying the question of Tilly Pine's insanity, would the evidence authorize you to find in its favor ? If not, can you find any just inference in this case in favor of

the prisoner? Is the daughter, Mrs. Potter, insane? She seems to have been a woman of strong religious feelings, which perhaps will account for all her peculiarities. Besides, she is but half sister to the prisoner, and may have derived her temperament from her mother. Both father and daughter discharged the duties incumbent upon them of father and wife. It is not pretended that a commission of lunacy could have been issued against either of them. We now come to the evidence of insanity in the family of Dr. Per Lee Pine, a cousin of the prisoner. It is shown that Lewis Pine, a brother, was deranged; the father was partially deranged, *after a severe loss.* As to the children, it may have come from mother or father, or originated with themselves. The father lived to an advanced age, and attended to his business through life. No one can contend that he was a confirmed maniac, or even subject to periodical insanity. It is for you to say, upon the whole, whether any well founded inference can be drawn from such evidence of insanity in relatives; especially when with one exception, the relatives are not in the right line of descent. As to the evidence of personal insanity. This defence is presented under very peculiar and somewhat suspicious circumstances. It is not pretended that the prisoner is *now insane.* If acquitted, he must be discharged, and could not be sent to the asylum, as the court understands the testimony. No witness speaks of his being insane. Not a single medical or scientific witness gives it as his opinion that he now is or ever was *insane.* The prisoner comes into court and says he was insane at the time of committing the act. Has he proved it? It is for you to scrutinize the testimony carefully, and not permit him to avoid punishment on that ground; unless made out to your full satisfaction. Generally a man is *presumed innocent*, and the great difficulty is to show *how* the deed was done, and *who* did it. In this case the situation of the prisoner is otherwise; there is no doubt of his being the homicide. The presumption is that he was *sane;* that is the general rule. The presumption is *against* his innocence. He must clear himself by satisfying you that he was incapable of perceiving

The People *v.* Pine.

the criminality of the act.   Eccentricity, or peculiarity of conduct, is not sufficient; they belong more or less to all men. Even partial insanity is not sufficient.   To come to the *personal acts* from which it is contended that insanity is to be inferred.  1. His hanging himself.   This was extraordinary; but it was done near a dwelling house.   He also laughed when asked why he did it.   2. No more is heard of it till 1843, when he lived at Pleasant Valley.   This it appears was about the time or soon after he lived at Mrs. Degroff's, where Mrs. Russell, then unmarried, lived.   Mr. Flagler saw him crying at times; breaking through the siding; attempted to shoot himself. These may be evidence of an aberration of mind, or of disappointment, or a disposition to terrify others.   If he was insane and wished to kill himself, it is strange he did not do it.   It is possible that the letter given in evidence, in which he speaks of a marriage agreement, may afford a solution; or it may be explained by reference to intoxication.   3. The occurrence on the night that he was removed to the county house with delirium tremens.   It is difficult to see how this establishes insanity.  4. Scene at Brown's last September.   It was of short duration, and occurred after he had been drinking.   5. Application to Isaac Lawton for a warrant.   He had been drinking, and seems to have had an idea that Mrs. Russell had wronged him.   What is here alleged may have been true without that degree of insanity which excuses.   6. The occurrence on board the towboat was extraordinary, unless it can be referred to delirium tremens.   There is some other evidence; but this case has been summed up very ably, and I will not detain you with it.   There are two theories by which these circumstances may be reconciled.   1. Periodical insanity; which is the theory set up by the prisoner's counsel; 2. A morbid thirst for revenge for a real or supposed injury arising from the rejection of his addresses by Mrs. Russell before her marriage, excited by liquor. It seems to me that this last view will explain and reconcile all the testimony, excepting the act of his boyhood.   The letter before alluded to refers to this subject.   In the first place, before the marriage of Mrs. R., he threatened to kill himself in view of

The People v. Pine.

the church, perhaps under a vague notion that she would learn of it and relent. After her marriage, he seems to have had an idea that he was in some way entitled to a share of *her property*—probably as a compensation for his injuries on his former indictment for burning the barn, or a reparation for refusing to marry him. It is hardly necessary to say that neither of these will *excuse him.* No *fancied* or *real injury* can justify the act. There is a further view of the case. Suppose it were established that the prisoner was liable to periodical fits of insanity—will the evidence permit you to acquit him? The rule of law, you will remember, is that in case of periodical insanity it must be proved that the act was committed during *an attack* of the disease.

How then stands the testimony as to his situation at the time of committing the act? On Friday he came to Poughkeepsie and bought the pistol, apparently sane. He returned to Pleasant Valley in the evening, apparently sane. On Saturday and Saturday evening he is proved to have been as sane as usual. On Sunday morning he was awakened by Sales, and cleaned the bar-room; sane yet. Took his breakfast as usual. Between 10 and 11 o'clock he and Mr. Holmes looked over the accounts and settled. About the same time he had a brief conversation with Mr. Bishop at the stable. Mr. Frear saw him about 12 o'clock, three-fourths of a mile from Russell's, going north; exchanged a few words, and considered him *sane.* Mr. Doty saw him about one-fourth of a mile from Russell's, and did not discover any signs of insanity. It is true that he drank several times; and one witness speaks of his having a wild eye, but the great mass of proof establishes him to be as sane as usual, nearly up to the time of the commission of the deed, and not excessively intoxicated. *When,* then, did he become insane? Was it at the moment of the act? The act itself cannot be taken *as evidence ;* it must be proven otherwise. Can it be supposed that during all the *preliminary arrangements of nearly three days* he was sane, and then became *insane* just at the time of firing the pistol? *Can* you believe that at the time this act was committed, the prisoner was so insane that

he was not able to perceive that the act was wrong or unlaw-
ful? Again, let us look at his subsequent conduct. Immedi-
ately after the deed was perpetrated, he *fled*. Why did he
flee? It is laid down in the books, it is a dictate of human
reason that the very *act of fleeing* and secreting himself, is in-
consistent, generally, with the idea of his not knowing that the
act was wrong or unlawful. The prisoner kept himself secre-
ted with great skill and cunning, from Sunday till Wednesday,
when he was *arrested*. No traces of insanity were found in
him when taken. If he had the *predisposition* to insanity
claimed by his counsel, which could be brought into action by
*suffering* or *excitement*, it is strange indeed that he was not
palpably mad when discovered, and now, on the trial. Trace
him down to the present time. He at once declared that he
had shot her, and would have done it if her husband had been
present; that her death was all he asked for. You have heard
the medical witnesses, Doctors Deyo and Hughson, who both
say that he has been sane since his confinement. The letter
of the 1st of February, 1848, bears no marks of insanity, but
shows that he was aware of his situation, and preparing for his
defence. Now all these facts are strikingly inconsistent with
insanity. The insane man, when he commits a crime, *gener-
ally* does not attempt to escape, because he does not know that
he has done wrong, and deserves punishment. Nor can he
make a skilful preparation for his defence.

It is for you to say whether, under this testimony, you can
find that this man was insane when he shot Mrs. Russell. His
conduct *here* is an unsafe basis for a verdict of acquittal. You
are to consider the case with care and patience, and if made
out to your satisfaction, give him the benefit of it. But you
are also to remember that you are administering criminal laws;
laws made for the protection of society; laws to which we must
look for our *safety*. If this is a case of murder, it ought to be
punished as such. The prisoner deserves it. The example to
others is required. The deliberate murderer should never
again be permitted to walk our streets, with an opportunity to

repeat his crime, and encourage others in the gratification of their revengeful passions.

Upon the whole, gentlemen, it is for you to say whether this man committed the deed wilfully and understandingly—if not, he must be acquitted. Public justice does not require the punishment of an *insane* man. If you are satisfied of his insanity, whatever be the consequences, he must be discharged. But public justice does require that if this act was not committed in a state of insanity which will excuse, it should be punished. You are not the ministers of *mercy* and *compassion*, but of justice ; your feelings as men, must yield to your duty as jurors. To permit a man legally guilty of such an atrocious offence to go at large, would be an example of the most dangerous character and tendency, well calculated to impair public confidence in the virtue and efficiency of our courts of justice.

The case, gentlemen, is with you ; and I trust your deliberations will be guided by that Wisdom which can never err.

*Note.* The jury found the defendant guilty ; and he was executed.

---

NEW-YORK SPECIAL TERM, April, 1848.    *Edwards,* Justice.