461 P.2d 677

STATE of Arizona, Appellee,

v.

Timothy MALUMPHY, Appellant.

No. 1751.

Supreme Court of Arizona.

In Banc.

Dec. 3, 1969.

Ross Lee, Public Defender, Vernon B. Croaff, Former Public Defender, Grant Laney, Former Deputy Public Defender, Lewis Roca Beauchamp & Linton, by John J. Flynn, James Moeller, Terry D. Oehler, Charles D. Roush, Phoenix, for appellant.

UDALL, Chief Justice.

Defendant Timothy Malumphy was convicted of two counts of first-degree murder and sentenced to death. We have reviewed the record of the trial and conclude that the judgment should be affirmed.

At the time of the offense defendant was employed as a waiter at Laffite's restaurant in Scottsdale, Arizona. He testified that for some time he had contemplated suicide but lacked the courage to take his own life. He therefore decided to kill someone else so that he could be tried for murder and given the death penalty. His plans took form on the afternoon of April 15, 1966, when he purchased a 38-caliber revolver from a Phoenix pawnshop. At approximately 6:15 p. m. on the same day he walked into the employee's dining room at Laffite's. He told one employee he was going to quit, and spoke to others about employment in Colorado Springs. Robert Bartlebaugh allegedly made a sarcastic remark to defendant, and defendant pulled out the gun and shot him in the chest. Constantine Karabogius was in the main dining room, and upon hearing the shot he entered the employee's room. Defendant then shot Karabogius in the stomach, and when he fell face downward on the floor he shot him again in the back. Bartlebaugh lived four hours, but Karabogius was dead upon the arrival of officers on the scene. Defendant then walked from the restaurant and some hours later gave himself up to his brother, a Phoenix policeman.

Defendant testified that he picked his two victims because "they didn't deserve to live." He further stated that his action in taking their lives was sanctioned by God, and that in God's sight he had done no wrong. He admitted that he knew he was breaking a law of society, and that society would condemn him for his action, but he felt that someone had to "stop" the two men from hurting others, and since his life was already ruined he was the one to do it.

At his trial defendant raised the defense of insanity at his mother's request. He stated on the stand that he hoped the jury would find him guilty and sentence him to death. Further, he made a motion in this court, which we denied, to have his appeal dismissed. We granted him the opportunity to appear before us on his own behalf, and in that appearance he stated

that he felt he had been given a fair trial and an appropriate sentence. Despite his efforts we have undertaken a review of the record, and will discuss the merits of the arguments presented by assigned counsel.

It is contended that the trial court erred in instructing on the M'Naghten rules as the test for criminal responsibility, rather than the test set forth in the Model Penal Code, § 4.01. We have considered the question of adopting a different test for criminal responsibility in this state on numerous occasions, and have consistently adhered to the M'Naghten rules. State v. Bradley, 102 Ariz. 482, 433 P.2d 273 (1967); State v. Schantz, 98 Ariz. 200, 403 P.2d 521 (1965). In Schantz we discussed § 4.01 of the Model Penal Code, and stated:

"Whatever may be the theoretical merits in the medical evaluation of the volitional aspects of the human mind, we; * * *, do not accept § 4.01 of the Model Penal Code as the test for criminal responsibility in this state."

We hold that the court properly instructed the jury as to the test for criminal responsibility.

It is contended further that the court erred in refusing to instruct the jury that it could consider evidence of defendant's mental condition in determining whether defendant, in fact, entertained premeditation and deliberation. The instruction embodies the precept commonly referred to as the doctrine of "diminished responsibility." We rejected the doctrine in State v. Schantz, supra, after an extensive discussion of the subject. We likewise reject it in this case for the reasons set forth in Schantz. Further, it would have been a useless gesture to give the instruction in the instant case since it was defendant's own testimony that the murder was carefully conceived and carried out according to the preconceived plan. Neither of the psychiatrists who examined defendant, and testified at the trial, stated that defendant's mental condition prevented him from entertaining the requisite premeditation.

The court refused to instruct the jury on second-degree murder and manslaughter. A defendant is entitled to instructions on the lesser offenses of second-degree murder and manslaughter if a reasonable interpretation of the evidence indicates that he could be guilty of these offenses. State v. Schroeder, 95 Ariz. 255, 389 P.2d 255 (1964). The facts here clearly point only to a conviction for first-degree murder. Further, as was stated in State v. Schroeder, supra, "When the sole defense to a charge of murder is an alibi, for example, or a plea of insanity, no instruction on included crimes is necessary."

Defendant was examined by two psychiatrists who both testified at the trial. It is contended that one of the doctors was prejudiced in favor of the state since he regularly testified for the County of Maricopa at insanity hearings. No prejudice appears in the record, and we will not presume that it existed. State v. McDaniel, 80 Ariz. 381, 298 P.2d 798 (1956).

Carlos Jiminez, an employee of Laffite's at the time of the shooting, was called by the state as a witness. On direct examination he gave an eye-witness account of the shooting and offered his opinion that defendant was normal and knew right from wrong. On cross-examination the following ensued:

"Q You stated earlier that he acted like a normal individual, did he act—was he acting normally when he shot Gus and Bart?

"Mr. Lim: Objection, your Honor. That's argumentative.

"Mr. Esser: Your Honor, I believe that counsel has opened the door as to whether he acted normally or not.

"The Court: Will counsel approach the bench?

"(Discussion off the record at the bench.)

The Court: Sustained."

It is contended that the court erred in not allowing the witness to answer the question as to whether defendant was normal when the shooting occurred. It is not clear from the record whether the court sustained the objection because it was presented in argumentative form or whether the court meant to keep the witness from rendering his opinion on defendant's mental condition. However, since the witness testified on direct examination that in his opinion defendant was normal and knew right from wrong, and since several other witnesses testified to the same effect, it is our opinion that any error that was made was harmless. State v. Eisenstein, 72 Ariz. 320, 235 P.2d 1011 (1951).

It is contended that A.R.S. § 13–453, which prescribes the punishment for murder, is unconstitutional in that it authorized the imposition of the death penalty in violation of the eighth and fourteenth amendments of the United States Constitution and §§ 4, 13, and 15 of Article II of the Arizona Constitution, A.R.S. We answered the question in State v. Boggs, 103 Ariz. 328, 441 P.2d 778 (1968), where we said:

"We hold that the imposition of the death penalty for a first-degree murder conviction is not violative of the cruel-and-unusual-punishment prohibitions of either the United States or Arizona constitutions."

During voir dire of the jury a prospective juror was questioned as follows:

"THE COURT: If you were selected as a trial juror in this case and if at the conclusion of the evidence you felt that the case warranted, would you have any moral or religious beliefs which would prevent you from voting for the death penalty?

"MRS. PERRY: Yes, sir, I do.

"THE COURT: You do?

"MRS. PERRY: Yes, sir.

"THE COURT: Is there any case or any state of facts which would in your belief warrant the imposition of the death penalty?

"MRS. PERRY: No, sir.

"MR. LIM: We will ask this juror be removed for cause, your Honor."

It is submitted by assigned counsel that the juror was improperly excused under the holding in Witherspoon v. State of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We do not agree. In Witherspoon the United States Supreme Court stated:

"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against this infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected."

The juror in the instant case expressed more than conscientious scruples against the infliction of the death penalty. She stated specifically that even if she felt the case warranted it she would be prevented from imposing death by her moral or religious beliefs. The following language from Witherspoon, supra, is clearly in point:

"The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. Nor does it involve the State's assertion of a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them."

The instant case comes within the above exclusionary language, and therefore the court did not err in excusing the juror for cause.

Affirmed.

STRUCKMEYER and HAYS, JJ., concur.

McFARLAND, Justice (specially concurring).

I concur in the results reached in the majority opinion; however, because of the importance of the decision, I feel that it is desirable to express my views on the question relating to the sanity of the defendant as it affects the case, both at the time of the commission of the acts and since that date. This requires a supplemental statement of the facts of the case.

Defendant Timothy Malumphy was charged with two counts of murder in the first degree. The first was the murder of one Constantine Karabogius, and the second the murder of one Robert Bartlebaugh. He was found guilty on both counts, and the jury fixed his punishment at death.

At the trial he was defended by the Public Defender's Office, who filed this appeal from the conviction and sentence. The Public Defender's Office filed an able and exhaustive brief in behalf of defendant, which was signed by Vernon Croaff, Public Defender, and Grant Laney, Deputy Public Defender. Defendant filed a motion in personam to dismiss the appeal, and requested to be allowed to represent himself. His motion to dismiss the appeal was denied by this Court, and an order entered to appoint John J. Flynn as his attorney. The firm of Lewis Roca Beauchamp & Linton, by John J. Flynn (hereinafter referred to as Flynn), also filed an able and exhaustive supplemental brief in behalf of defendant and a reply brief to appellee's answering brief.

On the 30th day of August 1968 defendant filed a motion for an evidentiary hearing to determine his mental ability to represent himself as his own counsel. Thereafter, on the 18th day of October, this Court made an order referring the question of defendant's mental competency to waive counsel and represent himself to the Superior Court of Maricopa County for determination. After hearings, the trial court answered in the affirmative.

The defendant, in his oral presentation before this Court, stated that he believed the imposition of the death penalty was justified, and, in fact, demanded that it be swiftly carried out. A defendant representing himself in an appellate court may not testify, and can only present matters which he would be able to present if he were an attorney; and no defendant should be permitted to choose his punishment for a crime.

The briefs of both the public defender and Flynn question the sufficiency of the instructions on insanity, it being contended that we should follow those recommended in the Model Penal Code. However, the objection to the instruction, which has been referred to as a test under the McNaghten rule as to sanity, is sufficiently broad to require an examination as to whether the instruction covers the law under the facts of the instant case. As pointed out by the majority, this Court has previously rejected other tests and approved the test under the McNaghten rule. State v. Schantz, 98 Ariz. 200, 403 P.2d 521. In Schantz, supra, we held:

"This test of legal insanity has two elements. An accused must have had at the time of the commission of the criminal act:

"(1) Such a defect of reason as not to know the nature and quality of the act, or

"(2) If he did know, that he did not know he was doing what was wrong."

For the first time we are confronted with the question should the court have instructed the jury as to whether the wrong referred to was a "moral wrong" or a "wrong against the law of the land," or both? This question requires a careful analysis of both the facts and the law relating to this subject.

In Flynn's opening brief it was stated:

" * * * we deal here with the awesome question of whether the State should take the life of a seriously disturbed young man. We approach the Court in confidence that the Court, in fulfilling its

grave obligation in this case, will willingly consider and carefully weigh all the arguments advanced by appellant in the light of contemporary constitutional standards and will re-examine with great care those issues which have heretofore been decided against appellant in an earlier day. * * * "

I agree that the evidence without question shows that the defendant was mentally disturbed; hence, the question must be carefully considered as to whether the proper test was used to determine whether he was legally sane at the time of the commission of the crime. Did the defendant "know the nature and quality of his acts"? If he did, did he know that what he was doing was wrong—wrong morally, usually referred to as under the laws of God, or wrong under the laws of man, or both? This requires an analysis of the evidence.

Defendant's early life was a series of unfortunate events. His father was either dead at Malumphy's birth, or died when he was an infant. There were four brothers; one of whom is now dead; and one is a city policeman. His mother worked, and defendant lived with his grandmother. He and his grandmother had a very close relationship, but his grandmother turned him against his mother, telling him his mother had abandoned him when he needed her the most. He had polio at an early age, and the grandmother never disciplined him after that. In 1949, upon the death of the grandfather, he was placed in Girard College Orphanage in Philadelphia. His grandmother died in 1958, and he was brought home from school to the funeral. He evidenced no sorrow whatsoever at her death, laughed in the funeral home, and acted as though he were at a party. He went back to the orphanage, but was expelled, after which he came to Phoenix to live with his mother who had remarried.

He enrolled in high school, but did not graduate. He thought he was entitled to have a car. He had earned some money, but because he was not permitted to buy a car he stole one for a joy ride, and was sent to Ft. Grant. After his discharge, he informed his mother that if she did not permit him to enlist in the Air Force he would quit school as soon as he was eighteen and enlist anyway.

He was charged with fraudulent enlistment because he had not revealed his commitment to Ft. Grant. It was proven that he did not fraudulently leave this matter out, but omitted it because the officer had told him it was not necessary. While awaiting court martial he was restricted to the base; however, he left the base on several occasions without permission and was reported by one of the airmen. Because he felt he was unjustly treated he took a gun and went to this airman's room, and told him he would shoot him. He shot at him, but missed. He took the airman's roommate as a hostage and shot him in the knees to punish the man who had reported him. In this regard he testified:

"Q. Do you have the same right to hurt someone that did not hurt you, to hurt someone else?

"A. I think in the cases where it's merited, yes, it does because if the right was not there then I wouldn't have, something would have happened and 1 wouldn't have shot him.

    *       *       *       *       *       *

"Q. Do you feel that it was the Lord in this case that was using you?

"A. I have to answer the question, yes, again because if He wasn't using me in the sense of instructing this punishment, then He wouldn't have let it go. He would have stopped it in some way or fashion."

Because of this incident he was court-martialed and sentenced to Fort Leavenworth. There he stabbed a fellow prisoner, was given psychiatric examination, and discharged from the federal prison, as it seemed there could be no purpose served by his further confinement. His mother testified that he needed psychiatric treatment, but would not sign a complaint for his commitment to the State Hospital. He secured work at various jobs—the last being at

Laffite's Restaurant in Scottsdale. It was there he became acquainted with the two victims. There was "bad blood between them" from the very beginning. According to his testimony he was mistreated. The number of his tables was cut down, thereby curbing his tips, and many times they would take the food he had ordered and give it to other customers and cause his customers to wait longer for their food. He would then get fewer tips, and he was having difficulty with his finances. On April 15, 1966, he purchased a gun. At approximately 6:15 p. m., he walked into the employees' dining room, told them he was going to quit, and spoke to the other employees about employment in Colorado Springs. After some words with the deceased Bartlebaugh he shot him, and then shot Karabogius when he came into the dining room.

In his testimony setting forth his reasons for killing the two decedents in the instant case, he testified:

"* * * If these men had turned around and done anything similar to what I did, then you have children, they are hurt, their wife is hurt, the whole family is hurt, where this man who didn't deserve to live had no right to breathe at all was going around breathing, why should somebody else that deserved it get hurt? Myself, I'm finished with my life, my life is finished.

"I expect, hope very much so, that at the end of this trial the jury will see fit to let me have the death sentence as I've asked for.

*    *    *    *    *    *

"Q Aren't there are [sic] other ways to take care of people like this?

"A Not that's going to have an effect, not that's going to last and in doing it also it's done in front of somebody else. When you do it, these people see it happen like the other waiters—alright, they say—now, hey, see what these rotten so and so's got. Very few of the waiters except for one other waiter—two other waiters, I'd say through the discussions we had like either of them as they were working and they will say—Hey, look, there guys look at all the rotten things they are doing, if I am like this, someday later on I may have a position and I make out. If I treat people wrong, what's going to happen to some other person coming along and seeing them doing this to me and nine times out of ten they wouldn't do it. And those two guys, you can't cure them, they are not curable. Unless you do something drastic, they are going to keep on doing it. They don't learn. Most of them—well, I shouldn't say most, I should say a large amount of them are very much hypocritical.

"Q Do you feel you had a right to do this?

"A Definitely. I definitely had the right to do it.

"Q Why?

"A Because I was doing something for society that really society consciously wouldn't say, yes, do it. But subconsciously would—would want it done because there were no good people. I was doing society a favor in it's [sic] own way—in my own way, I should say and the Man upstairs showed that this was right, that I was doing a service to society, that He condoned it.

"Q How do you know that?

"A Well, if He hadn't had condoned it, He would have stopped it. That's the same—same as I said before. The gun wouldn't have fired, I wouldn't have got the shells, I couldn't have got the gun, the man wouldn't have come to work, he wouldn't have been where I wanted it, so I could make it happen without involving too many people or letting somebody get hurt in that fashion and if He didn't want it done, anything could have happened. I could have had a car wreck. If my thinking was wrong and I wasn't right the Lord—He would have changed it, He wouldn't have let me go through with it, He wouldn't have let me think the way I think.

*    *    *    *    *    *

"Q Do you feel you had to do this?

"A I realized shortly after I had lost my job at Carefree that there was no other reason to live and that it must be my time to go back and seeing this was my time I can't take my own life, I guess it's cowardice. They say it takes a person with a lot of guts to kill himself. I don't have that guts. Well, there is only one way to do that, find somebody that doesn't deserve to live, that is rotten and no good and from past experiences there wasn't much trouble to find them.

"Q Do you deserve to die?

"A Definitely.

"Q Why?

"A Because I broke the law of the land.

"Q Do you feel you broke God's law?

"A Definitely not."

A number of psychiatrists testified at the trial. Dr. Carl Breitner testified:

"A I think Mr. Malumphy is suffering from a condition that fits best in the category which is described in the psychiatric glossary and manual of the American Psychiatric Association called a paranoid state.

\* \* \* \* \* \*

"A Paranoid state, it is manifested by delusions which as the book says, maybe so short lasting and or maybe of a chronic nature. These delusions have to be paranoid delusions to justify a diagnosis of a a paranoid state which again means delusions of persecution of delusions of grandiosity such as being endowed with special powers, have a mission by God to fulfill certain acts or to be better than the average individual and thereby be able to do things that others are not being able to do.

\* \* \* \* \* \*

"Q Did you find Mr. Malumphy's paranoid state to be chronic?

"A This, of course, has to be determined by the history and according to the history which I obtained and which I learned from previous files, this is a chronic condition, because he has manifested paranoid delusions of grandeur and persecution practically all—well, not all his life, I think, since the death of his grandmother in '58.

\* \* \* \* \* \*

"Q Now, in your opinion, Doctor, based upon a reasonable psychiatric certainly, was there any connection between the mental illness that you described which the defendant is suffering from and the shootings that occurred on April 15, 1966?

"A There is a connection, yes.

\* \* \* \* \* \*

"A The illness does not have too much effect on the self-control but it affects the thinking process. It affects the opinions of the individual so afflicted. It does, as I say, have a connection with his way of thinking but, I think, that most people suffering from paranoid states, including the defendant, are able to exercise self-control.

\* \* \* \* \* \*

"Q Doctor, do you have an opinion as to whether the shootings which occurred on April 15, 1966, were a product of such a mental disorder or disease you have described?

\* \* \* \* \* \*

"THE WITNESS: \* \* \* Yes, I think that the act is a product of this patient's mental status."

Dr. Richard E. H. Duisberg, after testifying as to defendant's background, stated, when asked for a diagnosis:

"A. Personality pattern disturbance, paranoid personality.

\* \* \* \* \* \*

"Q Based upon his telling you about the acts in question, would you have an opinion as to whether or not at the time of the crime itself he knew the nature and consequences of his act?

"A Yes, he did.

"Q And, Doctor, based upon what he has told you about the past life, all the

rest of it, did he know the difference between right and wrong?

"A He knew the social standard of right and wrong, yes.

"Q Does he also know, Doctor, that his own way is morally wrong?

"A He has a rather keen sense of moral right and wrong. He is quite indignant about the injustices that are in the world, the—he identifies to some extent with children. He feels that often they are not given a fair chance. He hates arrogance and self-righteousness in others and this in a sense is a rather keen sense of self-righteous morality.

\*    \*    \*    \*    \*    \*

"Q You found evidence of paranoid symptoms of self-justification?

"A Yes.

"Q You found evidence of—evidence of a profound defect in judgment?

"A Yes.

"Q You found evidence of grandiose hallucinations?

"A Grandiose hallucinations in the sense that he felt his judgment of an individual was enough for action."

I have not quoted from, nor discussed, the testimony of the experts at the hearing on the motion to determine whether the defendant was competent to represent himself before this Court, as it was only evidence for the purpose there introduced, but the testimony was much stronger there, in that two of the three experts stated that in their opinion he was not competent to represent himself. Their testimony went much further in regard to his mental ability to understand the nature and quality of the act than the expert testimony at the trial. This was true with regard to the testimony of one of the experts who also had testified at the trial. We must judge the case solely on the evidence that was before the court during the trial. We cannot consider evidence at that hearing nor statements made by the defendant himself before this Court in the course of argument.

In determining whether the "M'Naghten rule" should be modified, we have rejected the criminal-responsibility test set forth in the Model Penal Code, the irresistable-impulse theory, and the diminished-responsibility test, State v. Schantz, even though England, which gave us the McNaghten rule, has changed in favor of the latter test. Homicide Act, 1957 (586 Eliz. 2, c. 11), § 2.

We have for the first time a case in which the testimony shows that defendant believed that the act he was committing was right under the laws of God while admitting that he knew it was a violation of the "laws of society." It is also novel in that the defendant testified that not only did he feel it was his duty to kill the two decedents, but he also felt that his life was such that he would be better off dead, and that he did not have the nerve [guts] to take his own life, and it was one of his objectives in killing the men that he would then himself be executed. We must therefore determine the law as to the type of instruction necessary under such facts.

For our present purposes we need not indulge in relating the background and history of McNaghten and the other alternate approaches since this has been done often and exhaustively throughout the United States and Great Britain. Reference to but several of the many excellent opinions will suffice. See Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853 [Judge Burger's concurring opinion], cert. denied 375 U.S. 923, 84 S.Ct. 269, 11 L.Ed.2d 167; Harvey v. State (Miss.), 207 So.2d 108; Parsons v. State, 81 Ala. 577, 2 So. 854.

No question is raised here as to that part of the test relating to defendant's knowledge of the nature and quality of his act. The issue is the definition of the term "wrong." The defendant admits that he knew his actions were legally wrong, but insists that they did not offend the law of God—that these murders were not morally wrong.

Does McNaghten's rule allow for such a dichotomy of the term "wrong"? The biblical phrase "Render therefore unto Caesar the things which are Caesar's; and unto God the things that are God's" [Matt. 22:21] is of simple application until a person is placed in a situation where to render unto one does violence to the laws of the other. A person with a diseased mind, or suffering a delusion may find himself torn between what his pitiable condition leads him to believe, are two obligations. His mind compels him to follow his distorted view of his obligation to God. This is a conscious decision—not an irresistible impulse—but spawned by a diseased aberration of his mentality. Is he any the less insane because he is aware of the State law prohibiting his act? Even Blackstone had difficulty with this question of moral versus public responsibility.

"Of this nature, in the first place, is the obligation of *civil subjection,* whereby the inferior is constrained by the superior to act contrary to what his own reason and inclination would suggest: as when a legislator establishes iniquity by a law, and commands the subject to do an act contrary to religion or sound morality. How far this excuse will be admitted *in foro conscientiae,* or whether the inferior in this case is not bound to obey the divine, rather than the human law, it is not my business to decide; though the question I believe, among the casuists, will hardly bear a doubt. * * *" IV Blackstone's Commentaries 28 (Oxford Ed. 1966)

The poles of the involvement of moral law in the definition of "right from wrong" are best shown by two decisions from Kansas and Utah. In State v. Andrews, 187 Kan. 458, 357 P.2d 739, 747, the court stated:

"Perhaps, somewhat connected with the proposition of free will, is the contention by some people that the M'Naghten rule merely applies a moralistic concept as a criterion. This has never been thought by the courts, to our knowledge,

to be the meaning of the word 'wrong' as used in the rule. What is meant is that which is prohibited by the law of the land. A recent decision of the judges of the Queen's Bench in England discussed this matter specifically (Regina v. Windle, (1952) 2 Q.B. 826, (1952) 2 All Eng. 1)."

The cited case of Reg. v. Windle, supra (36 Cr.App.R. 85), decided prior to the Homicide Act, considered the definition of wrong as follows:

"* * * Counsel for the appellant, in his very careful argument, suggested that the word 'wrong' as it is used in the M'Naghten Rules did not mean contrary to law, but had some qualified meaning, that is to say, morally wrong, and that, if a person was in a state of mind through a defect of reason that he thought that what he was doing, although he knew it was wrong in law, was really beneficial, or kind, or praiseworthy, that would excuse him.

"Courts of law, however, can only distinguish between that which is in accordance with law and that which is contrary to law. There are many acts which we all know, to use an expression to be found in some of the old cases, are contrary to the law of God and man. In the Decalogue, are the commandments 'Thou shalt not kill' and 'Thou shalt not steal.' Such acts are contrary to the law of man and they are contrary to the law of God. In regard to the Seventh Commandment, 'Thou shalt not commit adultery' it will be found that, so far as the criminal law is concerned, though that act is contrary to the law of God, it is not contrary to the law of man. That does not mean that the law encourages adultery: I only say it is not a criminal offence.

"The test must be whether an act is contrary to law. * * *

   *    *    *    *    *    *

"In the opinion of the court, there is no doubt that the word 'wrong' in the M'Naghten Rules means contrary to law

and does not have some vague meaning which may vary according to the opinion of different persons whether a particular act might not be justified. * * *" But see Bergin v. Stack [1952], Austl. L.R. 810; R. v. Balaban [1954], S.Austl. S.R. 282.

On the other hand the Utah court has held that an offender, to be considered legally responsible, must know that his act is *both* legally wrong and morally wrong. In State v. Kirkham, 7 Utah 2d 108, 319 P.2d 859, the Court approved a jury charge which required acquittal because of insanity if the jury found "that, when he fired the shot, he did not know it was wrong in the sense that such act was condemned by morals or law." The Court said:

"Neither uncertainty nor confusion appears in such language. It tells the veniremen they *cannot* convict if they believe defendant was insane to such extent that he did not know his act was condemned morally; and it tells them that they *cannot* convict if they believe he was insane to the point where he did not know his act was condemned by law. * * *

"We consider that the instruction containing the disjunctive told the jury they could not convict defendant if they believed that because of mental disease he did not know his act was wrong morally, even though they believed he knew full well that his act was prohibited by law. We also consider that the instruction as given told the jury that they could not convict defendant if they believed that because of mental disease he did not know his act was legally wrong, even though they believed that he knew full well that his act was wrong morally. * * *.

"* * * The instruction as given made it possible for the jury to acquit defendant for either of two reasons, * * *." See also State v. Gardner, 219 S.C. 97, 64 S.E.2d 130.

One of the leading cases written upon the subject of the meaning of the word "wrong" as used in the test was an opinion written by the able and learned Judge Cardozo, later Justice of the United States Supreme Court, in People v. Schmidt, 216 N.Y. 324, 110 N.E. 945, L.R.A.1916D, 519, reargument denied 216 N.Y. 762, 111 N.E. 1095.

"The definition here propounded is the one that has been carried forward into our statute. The judges expressly held that a defendant who knew nothing of the law would none the less be responsible if he knew that the act was wrong, by which, therefore, they must have meant, if he knew that it was morally wrong. Whether he would also be responsible if he knew that it was against the law, but did not know it to be morally wrong, is a question that was not considered. In most cases, of course, knowledge that an act is illegal will justify the inference of knowledge that it is wrong. But none the less it is the knowledge of wrong, conceived of as moral wrong, that seems to have been established by that decision as the controlling test. That must certainly have been the test under the older law when the capacity to distinguish between right and wrong imported a capacity to distinguish between good and evil as abstract qualities. There is nothing to justify the belief that the words right and wrong, when they became limited by McNaghten's Case to the right and wrong of the particular act, cast off their meaning as terms of morals, and became terms of pure legality.

* * * * * *

"We have still another guide to help us to a sound construction of McNaghten's Case and of the statutory rule derived from it. That guide is found in the practice of judges by whom the decision has been applied. We refer to a few instances among many. In R. v. Townley, 3 F. & F. 830, Martin, B., left it to the jury to say whether the prisoner knew that the act was 'contrary to the law of God and punishable by the law of the land.' In R. v. Layton, 4 Cox,

C.C. 149, Rolfe, B., said that the jury must determine whether the prisoner's delusion 'had the effect of making him incapable of understanding the wickedness of murdering his wife.' See, also, R. v. Law, 2 F. & F. 836. In many cases, both in our own courts and in those of sister states, the language of Lord Mansfield in Bellingham's Case, supra, is adopted with trifling changes, and the test is said to be whether the defendant understood that the act was forbidden 'by the laws of God and man.' People v. Waltz, 50 How.Prac. 204, 232; People v. Pine, 2 Barb. 566, 570; Casey v. People, 31 Hun, 158, 161. * * *"

It should be interjected at this point that Judge Cardozo's decision on this point is supported by the language used at McNaghten's trial in the Central Criminal Court reported in IV Reports of State Trials (New Series) 847. The Solicitor General, in the McNaghten case, in his statement to the jury, recognized that there must be a violation of both the laws of God and man:

"* * * The whole question will turn upon this: if you believe the prisoner at the bar at the time he committed this act was not a responsible agent; if you believe that when he fired the pistol he was incapable of distinguishing between right and wrong; if you believe that he was under the influence and control of some disease of the mind which prevented him from being conscious that he was committing a crime; if you believe that he did not know he was violating the law both of God and man: then, undoubtedly, he is entitled to your acquittal. * * *"

Lord Chief Justice Tindal, presiding at the trial and later rendering his opinion to the House of Lords in McNaghten's case, included the following in his charge to the jury:

"Tindal, C. J.: Gentlemen of the jury, in this important case which has excited very great anxiety during the two preceding days, the point I shall have to submit to you is whether on the whole of the evidence you have heard, you are satisfied that at the time the act was committed, for the commission of which the prisoner now stands charged, he had that competent use of his understanding as that he knew that he was doing, by the very act itself, a wicked and a wrong thing. If he was not sensible at the time he committed that act, that it was a violation of the law of God or of man, undoubtedly he was not responsible for that act, or liable to any punishment whatever flowing from that act. * * *" Id. at 925

This use of the term "wrong" casts doubt on the interpretation given McNaghten in R. v. Windle, supra.

Judge Cardozo's opinion in Schmidt continues:

"* * * In Commonwealth v. Rogers, 7 Metc. (48 Mass.) 500, 41 Am.Dec. 458, Shaw, C. J., in expounding the rule, assumed for illustration an insane delusion that God had commanded a crime. He told the jury that a defendant, to be responsible, 'must have sufficient power of memory to recollect the relation in which he stands to others, and in which others stand to him; that the act he is doing is contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty'; and then to explain the delusions that will relieve a man from criminal liability, he said:

"'A common instance is where he fully believes that the act he is doing is done by the immediate command of God, and he acts under the delusive but sincere belief that what he is doing is by the command of a superior power, which supersedes all human laws, and the laws of nature.'

"In Guiteau's Case (D.C.) 10 F. 161, these words were quoted approvingly, and supplemented by other illustrations. The court instanced the case of a man known to be an affectionate father who 'insists that the Almighty has appeared

to him, and commanded him to sacrifice his child.' Of these and like cases, the court said (page 182 of 10 F.):

" 'If a man insanely believes that he has a command from the Almighty to kill, it is difficult to understand how such a man can know that it is wrong for him to do it.'

"Such a man is no less insane because he knows that murder is prohibited by human law. Indeed, it may emphasize his insanity that, knowing the human law, he believes that he is acting under the direct command of God.

"Cases may be found where, in explaining what is meant by knowledge that an act is wrong, the courts have blended the elements of legal and moral wrong, but none, we believe, can be found in which the element of moral wrong has been excluded. * * *

\*   \*   \*   \*   \*   \*

"We hold therefore that there are times and circumstances in which the word 'wrong,' as used in the statutory test of responsibility, ought not to be limited to legal wrong. A great master of the theory and practice of the criminal law, Sir James Fitz-James Stephen, in his General View of the Criminal Law of England (pages 79, 80), casts the weight of his learning and experience in favor of that view. See, also, 2 Stephen, History Criminal Law, p. 168. Knowledge that an act is forbidden by law will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals. Obedience to the law is itself a moral duty. If, however, there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he knows the act to be wrong."

Thus, Judge Cardozo walked a middle path between the doctrines expounded in Kirkham, supra, and Andrews, supra. In contrast to the complete rejection of moral wrong in the Kansas case and the double standard of wrong in the Utah case, Cardozo formulated a "blend" of both moral and legal wrong. In illustration, Judge Cardozo gives the following:

" * * * We must not, however, exaggerate the rigor of the rule by giving the word 'wrong' a strained interpretation, at war with its broad and primary meaning, and least of all, if in so doing, we rob the rule of all relation to the mental health and true capacity of the criminal. The interpretation placed upon the statute by the trial judge may be tested by its consequences. A mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice. It seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong. If the definition propounded by the trial judge is right, it would be the duty of a jury to hold her responsible for the crime. We find nothing either in the history of the rule, or in its reason and purpose, or in judicial exposition of its meaning, to justify ⸢ a conclusion so abhorrent. * * *"

In my opinion Cardozo's "middle-of-the-road" refinement of McNaghten's rule is the correct test rather than the strict application of "legal wrong only" in State v. Andrews, supra, and the liberal "either-or, legal or moral wrong" set forth in State v. Kirkham, supra. It is my belief that even where a defendant is aware that a particular act is a violation of the law, if he harbors a delusory belief, which is the product of mental disease of such magnitude that he believes that the act is not morally wrong, and that as a result of such mental disease he is unable to understand that it is wrong for him to violate the law prohibiting the act, then he is not criminally responsible.

The evidence in the instant case does not show the defendant was unable to under-

stand it was wrong for him to kill the decedents. He was lucidly aware that his acts were wrong in that they violated the law.

The testimony of the experts and of the defendant show that defendant thought that the acts he committed were not morally wrong; also that he was aware that the acts were a violation of the law. The question then in the instant case is not just whether he was aware that his acts were a violation of the law, but whether he harbored a delusionary belief which was a product of mental disease of such magnitude that he did not believe it was wrong to so violate the law. The evidence would have to show not just that he did not believe it was legally wrong, but that the belief was the result of such mental disease. The evidence in the instant case was not sufficient to justify such a finding. Therefore, it was not prejudicial error for the court to fail to distinguish between moral and legal wrong in its instruction defining the test to be applied for insanity.

I, therefore, concur in the result reached by the majority.

LOCKWOOD, V. C. J., concurs.